**UNITED STATES, Appellee,**

v.

**Glenn COFIELD, Private First Class,
U.S. Army, Appellant.**

No. 38,733.
CM 438090.

U. S. Court of Military Appeals.

Aug. 24, 1981.

For Appellant: *Captain Robert L. Gallaway* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Charles A. Byler, Captain Edward J. Walinsky* (on brief); *Lieutenant Colonel John F. Lymburner, Captain Julius Rothlein.*

For Appellee: *Colonel R.R. Boller* (argued); *Major Paul G. Thompson, Major Ted B. Borek* (on brief); *Douglas P. Franklin, Captain Brian X. Bush.*

*Opinion of the Court*

EVERETT, Chief Judge:

In February 1979, appellant was tried at Fort Ord, California, by a general court-martial composed of officers. Contrary to his pleas, he was found guilty of possession and transfer of phencyclidine, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad-conduct discharge, confinement for 12 months, forfeiture of $250 pay per month for 12 months, and reduction to the grade of Private E–1. The convening authority approved the bad-conduct discharge, confinement and forfeiture of $150 pay per month for 8 months, and reduction to private E–1.

Initially this Court denied appellant's petition for grant of review (9 M.J. 122), but, after considering appellant's motion for reconsideration, we granted review (9 M.J. 204) of his claim that the military judge had erroneously ruled that a prior summary court-martial conviction could be used for impeachment purposes and that this ruling had prejudiced Cofield by dissuading him from testifying in this "closely contested case." We conclude that error exists which requires a new trial.

I

During an Article 39(a), 10 U.S.C. § 839 session at the outset of appellant's court-

martial, his civilian defense counsel made a motion *in limine* for the military judge to rule that a June 1977 summary court-martial conviction of the appellant[1] could not be used "for purposes of impeachment of the defendant should he take the stand as well as for aggravation." Defense counsel, who argued strenuously that our decision in *United States v. Booker*, 5 M.J. 238 (C.M.A. 1977), prohibited such use, wished to obtain this ruling early in the trial before deciding whether appellant should testify on the merits. In support of the motion *n limine*, she made an offer of proof "that the accused was tried by a Summary Court-Martial for the offense of theft on or about the 20th of June 1977 and that he did not have the advice of counsel—or assistance of counsel, and that he in effect represented himself at the Summary Court-Martial." Moreover, "the accused had sought out counsel and was informed that he was not entitled to have counsel at a Summary Court-Martial, and accordingly represented himself at the summary court-martial." Trial counsel did not rebut this offer of proof, but instead contended that any comment in *Booker* about use of the record of a summary court-martial for impeachment purposes was only "*dicta*." After arguments on the motion, the military judge ruled "that the Summary Court Conviction will be permitted to be used by the Government for both impeachment and aggravation."

At a later out of court hearing, this exchange between the judge and trial counsel occurred:

TC: Your Honor, at this time the Government—while we are out of court—will offer ... Prosecution Exhibit 2. Granted, it may never be used—

MJ: Prosecution Exhibit 2—haven't we already got something as Prosecution Exhibit 2?

TC: It's marked—this was the court-martial order.

MJ: Okay.

TC: —the conviction.

MJ: All right.

TC: Granted, it may never be used should the accused not testify or should we not get to the sentencing portion; however, while we are out of court I thought that it should be brought up now.

MJ: I ah—obviously expect the defense counsel to object based on their original motion and the record will note that you do object to it. Prosecution Exhibit 2 for identification will be received into evidence as Prosecution Exhibit 2 and may be used for impeachment during the proceedings as appropriate, and should it come to sentencing it may be used in aggravation.

Proceeding with its case in chief, the Government called as its first witness Richard Colclough, who was an agent of the Criminal Investigations Division (CID). He testified that, on October 17, 1978, at Ford Ord, California, while at appellant's quarters with Cofield and a confidential informant James Tubbs, he had seen the appellant in possession of two cigarettes laced with phencyclidine (sometimes called "Angel Dust" and hereinafter referred to as "PCP"). The two cigarettes appeared the same except that one was shorter than the other and appeared to have been cut and used. When appellant asked $50.00 for one of the cigarettes, Colclough responded that this price was too high and counteroffered $30.00. Appellant "would look at ... Private Tubbs ... to get an okay ... that $30.00 would suffice for the deal." Ultimately, Colclough received one of the cigarettes and gave appellant $30.00. However, because Tubbs, the confidential informer, seemed to be "somewhat controlling the actions," Colclough "didn't feel right" and "simply terminated the deal at that time." This termination was accomplished "by taking back the [$30.00] that was laying on the table" and departing from Cofield's quarters along with Tubbs; but, Colclough retained in his possession the cigarette that he testified had been delivered to him by

---

1. This conviction was evidenced by a summary court-martial order (pros. ex. 2).

appellant. After he and Tubbs returned to the CID office and discussed the matter with his supervisor, Colclough went back to Cofield's home and redelivered the $30.00 to him. Thus, according to Colclough's testimony the deal was finally completed.

On cross-examination, Colclough conceded that before this occasion, he had never handed over money to buy contraband and then taken back the money along with the very item which he was supposedly purchasing. He also explained that, although he did not believe that the cigarette he purchased belonged to Private Tubbs, he "had my doubts about the situation" and therefore he "had to somewhat go back and regroup and talk to Private Tubbs and find out exactly what the story was."

By several later witnesses the Government established that the cigarette obtained by Colclough had been transmitted to the crime laboratory at Fort Gordon, Georgia, for analysis. According to the forensic chemist who testified at trial, his analysis revealed that the cigarette was laced with PCP.

Called as a defense witness, Private Tubbs testified that he had bought the two PCP-laced cigarettes for $80.00 from a drug dealer, Specialist Anderson.[2] Thereafter, Tubbs had driven with appellant over to the latter's house, where he picked up some sweat pants and changed clothes. Then he "tossed" the wrapped package containing the cigarettes to Cofield and "told him to ... put this someplace until [Tubbs] got back." They were "half-late anyway and ... had to get back to the company"; and Tubbs told Cofield that he would pick up the package after they "got through with the running" exercise that was scheduled.

Subsequently Tubbs encountered Colclough, who informed him that Anderson had reported that appellant had a package of PCP-laced cigarettes. Tubbs then told Colclough that, in fact, he had the package which had been obtained from Anderson, but that it was at Cofield's house. According to Tubbs, at that time he did not know that Colclough was a CID agent; nor had

he ever "worked with him as a confidential informant." Colclough and Tubbs went to appellant's house, where Cofield handed back to Tubbs the package which he had left there earlier. Colclough looked at the package and there was discussion of a purchase price. "He asked Cofield because he saw Cofield with the package, and I butted in and interrupted and told him that it was for fifty dollars." Cofield had not known what was in the package when Tubbs left it at appellant's house earlier in the day. Moreover, the conversation about price was between Tubbs and Colclough, rather than between Colclough and appellant. Finally he told Colclough "that $30.00 is the lowest price that [he] could go and then he put the money down on the table." When Colclough asked the appellant, "is thirty dollars a cool price?", the appellant "said that he didn't know ... what was going on." Cofield asked Tubbs whether he could speak to him "over to the side" and told Tubbs that "he didn't want [him] to sell anything in his house." Colclough then "picked the money back up and put the money back in his pocket and said, 'lets go.'" Tubbs then testified that he "grabbed" one of the PCP "stick[s]" from the table and later gave it to Colclough.

After Colclough and Tubbs left together in the former's car and drove three blocks, Tubbs "told Colclough that [he] owed Cofield some money and while [he] had the money [he] should give it to him since [he and Cofield] were this close." They returned to Cofield's house, where he was outside helping someone fix a car window. "Then Colclough got out of the car and gave Cofield the money and got back into the car and [they] left."

During an out-of-court hearing that followed the direct examination of Tubbs, the military judge asked defense counsel if appellant were going to testify. Upon receiving a negative response, the judge advised Cofield of his right to remain silent without having any adverse inference drawn therefrom and confirmed that appellant had discussed with counsel his right to testify.

---

**2.** Later Tubbs testified that he had acquired the cigarettes from Anderson on credit.

On cross-examination, Tubbs adamantly refused to concede that he had made any prior statements inconsistent with his testimony; and he denied that he and Cofield had agreed to split the $80.00 that Tubbs had owed Anderson for the two PCP-laced cigarettes. Moreover, in response to a court-member's question about the events at appellant's house, Tubbs reiterated that

Cofield ... said that he didn't know what was going on and he really didn't want me to do it there or whatever I was doing and so then Colclough looked at Cofield in a funny way and I looked at him—Colclough—and Colclough grabbed the money—picked up the money—and put the money in his pocket, and put the cigarette down and walked out the door. I picked up the cigarette and told him to hold up because I needed a ride because Cofield was staying home as he was in the process of washing his car when we first got there.

Upon the conclusion of Tubb's testimony, the court recessed overnight. When it convened the next morning, defense counsel urged the military judge to reconsider his earlier ruling that Cofield's prior conviction by summary court-martial could be used for impeachment; and this colloquy occurred:

IDC: I just have one matter that I would like to bring up your Honor. Captain Brackett and I and the defendant have discussed this at some length and we would like to ask the court to reconsider the ruling on whether or not the previous conviction can be used for impeachment.... [T]hat ruling clearly makes a difference—as to whether or not we can call the accused to the stand and we feel that it is critical quite frankly—

MJ: Well, I suspect that.

IDC: —that you know—that ah—the accused be able to take the stand and explain the circumstances particularly in light of the clearly contradictory testimony that has been given by Special Agent Colclough and Private Tubbs. Yet, you know ah—it is extremely damaging ah—for the defendant to be

impeached with a prior conviction where he wasn't represented by counsel and we would simply ask the Court to reconsider that ruling because it truly places the defense on the horns of a dilemma and it might—you know—clearly made a difference as to whether or not we can or cannot call the defendant to the stand.

MJ: Well, I understand your dilemma and I understood it then. The *Deoliveria* [sic] Case, which is a Court of Review Case, seems to be good law. I'm bound to follow what in my judgment is good law. Have you got anything to the contrary of that?

IDC: I have no authority to the contrary.

MJ: I don't guess it is appropriate to say that I am sympathetic with your position because ah—I'm not paid to be sympathetic. I think I am also bound to follow the law. So, I decline to change my ruling, Ma'am.

After the judge refused to change his earlier ruling, Cofield did not take the stand to testify on the merits of this case. However, the defense did call two other witnesses—a Specialist Fauntleroy and the appellant's wife. Fauntleroy testified that he had been working on his car in October, 1979, when a person (not Tubbs) handed appellant some money and stated that it was "from Tubbs." Cofield's wife, who had been at home and observed some of the events, corroborated portions of Tubb's testimony, such as his account that her husband had thrown away the one cigarette remaining after Colclough left with the other cigarette.

In rebuttal, the Government recalled Special Agent Colclough, who enumerated four prior cases in which he maintained that Private Tubbs had been involved with him as a confidential informant. Moreover, Colclough testified that Tubbs "was operating as a confidential informant when I met him." Other rebuttal witnesses also impugned Tubbs' credibility.

After appellant had been found guilty, the Government presented as evidence the record of his conviction by summary court-

martial for larceny, as well as the record of an Article 15. Then, after various character witnesses had been presented, appellant gave sworn testimony in extenuation and mitigation. In that connection, he explained that he had pleaded not guilty to the charge of which he was convicted and had been in fact not guilty thereof. Also he explained the circumstances of the Article 15 that he had received for failure to repair. When appellant began to testify concerning the events that were the subject of the present trial, trial counsel objected to "getting into a re-litigation of the facts," whereupon this discussion ensued:

MJ: Well, Ma'am—my instructions remain the same. I'm not going to permit you to re-litigate whether this accused is guilty or innocent. Now, if you want to do some explaining that's fine, but if you are going to transgress across that line the answer is stop.

IDC: Well, I want to note an objection then your Honor because I think that he has an absolute right to explain to the members of the court what happened.

MJ: Well, he may explain it but it does not go to guilt or innocence. Now, I think you understand full well what I mean. The jury had decided his guilt or innocence and I will permit you to explain certain aspects of it and I think you are well aware of that. So, please proceed.

When appellant resumed his testimony, the military judge soon interrupted to preclude appellant from testifying about the offenses of which he had just been found guilty.[3] Later, in response to a question from the military judge, appellant emphasized his desire to stay in the Army. After arguments and instructions, the court-martial adjudged the sentence.

Before the United States Army Court of Military Review, the appellant contended that the military judge committed prejudical error in his rulings as to the use of the prior conviction by summary court-martial for impeachment and aggravation. As to impeachment, the court below held in an unpublished opinion that, since the appellant had not testified on the merits, it would not speculate as to whether he had been prejudiced in some way. The court also observed that, as a personnel record reflecting the past performance and conduct of the accused, the summary court-martial conviction had been properly admitted into evidence during the presentencing phase of the appellant's court-martial. We are only at odds with the court's view as to use of the conviction for impeachment purposes.[4]

## II

These three separate questions can be identified as implicit in the present appeal: (a) Since he did not testify, is appellant entitled to review of the military judge's ruling as to the admissibility of the summary court-martial conviction for impeachment purposes? (b) If he is entitled to review, was the judge's ruling in error? and, (c) If error occurred, was appellant prejudiced thereby? A close relationship exists between these three issues. One reason for judicial reluctance to allow review under circumstances like those of the case at bar is the difficulty of determining somewhat in the abstract whether an erroneous ruling has been made. For example, even if we rule that usually a conviction by summary court-martial is inadmissible to impeach an accused after he has testified on

---

3. A court-martial may reconsider its findings until the time that sentence is adjudged; and sometimes this reconsideration occurs. *See, e. g., United States v. Thomas,* 11 M.J. 315 (C.M.A.1981); *United States v. Waldron,* 11 M.J. 36 (C.M.A.1981). In light of this power, there may be some reason to allow considerable leeway to an accused who during extenuation and mitigation takes the stand for the first time at trial.

4. We recently observed "that the record of the summary court-martial was admissible for consideration by the military judge in determining an appropriate sentence." *United States v. Kuehl,* 11 M.J. 126, 127 (C.M.A.1981); *see United States v. Mack,* 9 M.J. 300 (C.M.A.1980). Therefore, the military judge was correct in admitting this record during presentencing for aggravation of the sentence.

direct examination, there may be extraordinary circumstances when such a conviction would be admissible—for example, if an accused uses inadmissibility as a sword, rather than a shield, by testifying on direct examination that he has never been convicted of an offense by any kind of court-martial. *Cf. Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). Similarly, the difficulty of establishing whether an erroneous ruling prejudiced an accused who has not taken the stand undoubtedly has helped induce some courts to forestall the inquiry as to prejudice by simply refusing to review the ruling of the trial court unless the appellant has testified.[5]

Despite the difficulties of reviewing for prejudicial error a trial judge's ruling which on a contingent basis upholds the admissibility of certain evidence to impeach a defendant who thereafter does not take the stand, Federal courts of appeals have in recent years demonstrated increasing willingness to undertake review under such circumstances.[6] For example, the Court of Appeals for the First Circuit reviewed the issue in a case similar to the one at bar. *See United States v. Hickey*, 596 F.2d 1082 (1979), *cert. denied*, 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 70 (1979). There the trial judge granted defendant Ferreira's pretrial motion to suppress incriminating evidence about an alias, because information about the alias had been elicited from him in violation of his *Miranda* rights.[7] Later, as the trial was in progress, Ferreira requested an advance ruling on his motion to prevent the prosecutor from cross-examining him about the alias, or making any reference

thereto, unless he testified with regard thereto during his direct examination. In this connection, defense counsel indicated to the court that Ferreira would testify in his own behalf. The judge "ruled, ... [however,] that the [defendant] could be cross-examined as to [the] aliases and nicknames," *id.* at 1085, regardless of whether he "opened the door" to this testimony as a result of his direct examination, and that if the defendant then denied having been known by the alias he had disclosed to the FBI, the prosecutor could use defendant's suppressed statement to impeach him. Fearing such an outcome, the defendant did not testify.

On appeal, the Government contended, *inter alia*, that the court was precluded from reviewing the judge's ruling since the defendant did not take the stand and

> both because the court's ruling was not clear and because this court can never know what issues his direct testimony, or his answers on cross-examination, would have raised.

*Id.* at 1085. However, the First Circuit held that the ruling was clear and that

> [o]n the facts of this case, we would be loath to hold, without precedent, that Ferreira waived his claim when he decided not to take the stand. A concrete issue existed at the time the ruling was made and, in our view, is no less present now because the immediate resolution of that issue caused Ferreira not to testify. The court made a ruling and Ferreira cannot be faulted now for having taken it at its word. It would be unfair to inform a defendant that by relying on an express

5. The underlying policy is somewhat like that of Mil.R.Evid. 103(a)(2), which requires an offer of proof when a ruling is made which excludes evidence. *Cf.* Fed.R.Evid. 103(a)(2).

6. *Cf.* Mil.R.Evid. 103(a)(1). Fed.R.Evid. 103(a)(1) provides: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected, and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific

ground was not apparent from the context." In a sense, a ruling like that of the judge in the case at hand does not *admit* evidence for, unless the accused takes the stand, the record of conviction is not offered into evidence as to guilt or innocence. However, this sort of literalistic approach apparently has not deterred review by Federal appellate courts of rulings on motions *in limine*.

7. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ruling of the district court he had waived his right to challenge it.

The Court further observed:

This circuit has never adopted a rule that a defendant will be held to have waived his objections to an advance ruling unless he takes the stand. Such a rule to some extent would be inconsistent with our decision, in the special area of prior convictions, to encourage (although not to require) advance rulings on admissibility where the trial court, in its discretion, finds them appropriate. *See United States v. Oakes,* 565 F.2d 170, 173 (1st Cir.1977). In that same area, at least two circuits have reviewed advance rulings as to the admissibility of convictions where the defendant, as a result of the ruling, decided not to testify. *Brown v. United States,* 125 U.S.App.D.C. 220, 370 F.2d 242 (1966); *United States v. Palumbo,* 401 F.2d 270 (2d Cir.1968), *cert. denied,* 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969).

*Id.* at 1087.

In *United States v. Smith,* 551 F.2d 348 (D.C.Cir.1976), the Court of Appeals for the District of Columbia also allowed a defendant, Gartrell, to contest on appeal the trial judge's "ruling that a prior conviction would be admissible for impeachment purposes if Gartrell chose to testify in his own defense," even though he had not taken the stand. *Id.* at 356. The Court reasoned:

Had evidence of his prior conviction been excluded, appellant Gartrell in all likelihood would have taken the stand and the jury presumably would have heard him deny participation in the bank robbery. As explained further below, we cannot say, on the facts of this case, that failure to apply Rule 609 constituted harmless error.

\* \* \* \* \* \*

As we indicated at the beginning of this part of our opinion, we cannot view as harmless error (28 U.S.C. § 2111 (1970); Fed.R.Crim. P. 52) the trial court's failure to follow Rule 609 in decid-

ing whether to permit impeachment of Gartrell by prior conviction evidence. Gartrell expressed a desire to testify in his own defense. His attorney informed the District Court that Gartrell wished to deny any connection with the robbery. We can only infer that Gartrell was dissuaded from this intention primarily by the trial court's refusal to exclude evidence of his prior conviction, an attempted robbery offense two years earlier for which he had been sentenced to six years' probation.

*Id.* at 357, 365 (footnote omitted).

In *United States v. Cook,* 608 F.2d 1175 (9th Cir.1979), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980), although some of the issues on appeal were addressed and resolved by only a panel of three judges, the Court of Appeals for the Ninth Circuit sitting *en banc* voted specially to define the Circuit's position as to whether a defendant who did not testify can complain on appeal about a ruling that he could be impeached by prior convictions if he testified at trial.[8]

Resolving a prior conflict of views within the circuit, *compare United States v. Fulton,* 549 F.2d 1325, 1327 (9th Cir.1977), and *United States v. Murray,* 492 F.2d 178 (9th Cir.1973), *cert. denied,* 419 U.S. 854, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974), *with United States v. Brashier,* 548 F.2d 1315 (9th Cir.1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977), it was held, over the dissent of five judges, that

[i]t is unrealistic to continue to refuse to review these rulings unless the defendant takes the stand. The effect of the preliminary ruling can substantially change the course of the trial, and any ruling which so changes the course of a trial ought to be subject to judicial review.

*Id.* at 1183. In concluding, the opinion reiterates that

on the point taken *en banc,* we hold that the categorical rule of *United States v. Murray, supra,* which denies appellate re-

---

**8.** *See* Fed.R.App. P. 35(a), which concerns hearings or rehearings *en banc.*

view unless the defendant testifies and is impeached, is no longer the law.

*Id.* at 1187.

In *United States v. Langston*, 576 F.2d 1138 (5th Cir.1978), *cert. denied*, 439 U.S. 932, 99 S.Ct. 324, 58 L.Ed.2d 327 (1978), the defendant moved before trial to prevent the Government from using evidence of his prior criminal convictions to impeach his credibility. However, the trial judge ruled that three of the felony convictions were admissible for impeachment purposes under Fed. R.Evid. 609(a)(1).[9] Thereafter, Langston elected not to testify and, of course, these convictions were never used. Nonetheless, it was held:

> Langston's failure to testify does not moot the issue of the admissibility of the prior convictions. *See United States v. Smith*, 1976, 179 U.S.App.D.C. 162, 170–171, 551 F.2d 348, 356–57.

*Id.* at 1139. This same position has been taken in later cases from the Fifth Circuit. *See United States v. Toney*, 615 F.2d 277 (1980), *cert. denied*, 449 U.S. 985, 101 S.Ct. 403, 66 L.Ed.2d 248 (1980);[10] *United States v. Hitsman*, 604 F.2d 443, 447 (1979).

In *United States v. Fountain*, 642 F.2d 1083 (7th Cir.1981), the Court of Appeals considered the defendant's contention that the trial court had improperly disposed of his motion for an advance ruling that his prior convictions could not be admitted into evidence to impeach him. Quoting from the *en banc* opinion of the 9th Circuit in *United States v. Cook, supra*, the Court of Appeals reasoned that

> "Motions *in limine* have proven their value in litigation. They save jury time, and avoid the waste that sometimes results from haste when side-bar matters have to be urged in the course of the trial. To persist in holding that rulings

made in advance of trial are unreviewable unnecessarily discourages the use of such motions." 608 F.2d at 1186.

Furthermore, the Seventh Circuit in *Fountain* even held unnecessary "the trial court's requirement that the defendant 'commit himself' to testifying, should the convictions be excluded." 642 F.2d at 1083.

The decision of the Court of Appeals for the Eighth Circuit in *United States v. Johnston*, 543 F.2d 55 (1976), is sometimes cited for the proposition that a defendant waives his right to complain of a ruling like that in the case at bar unless he has taken the stand.[11] However, the scope of the *Johnston* case is unclear, since there the trial judge refused to make an advance ruling whether a prior conviction could be used to impeach the defendant. The Court of Appeals only said that

> until Johnston took the stand, which he chose not to do, the court had no duty to rule on his pretrial motion regarding the admissibility of evidence of his prior convictions for purposes of impeachment.

*Id.* at 59. Accordingly, *Johnston* does not apply directly to a case like that at bar, where the trial court ruled that certain evidence will be admissible to impeach the defendant and consequently defendant elects not to testify.

In *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), the Supreme Court reviewed the correctness of a ruling which had apparently induced the defendant's decision not to take the stand. Portash had been granted immunity to testify before a state grand jury where under

> if Portash testified before the grand jury, neither his statements nor any evidence derived from them could, under New Jersey law, be used in subsequent criminal

---

**9.** *Cf.* Mil.R.Evid. 609(a)(1).

**10.** The decision in *United States v. Langston*, 576 F.2d 1138 (5th Cir.1978), *cert. denied*, 439 U.S. 932, 99 S.Ct. 1138, 58 L.Ed.2d 327 (1978), is binding on other panels within the Fifth Circuit. *Hodge v. Seiler*, 558 F.2d 284, 287 (5th Cir.1977). However, despite the persuasive concurring opinion to the contrary by Judge Tjoflat in *United States v. Toney*, 615 F.2d 277,

280 (5th Cir.1980), *cert. denied*, 449 U.S. 985, 101 S.Ct. 403, 66 L.Ed.2d 248 (1980), the Court of Appeals for the Fifth Circuit has apparently not elected to consider *en banc*—and possibly overrule—the principle established in *Langston*.

**11.** *See* Government's Answer to Final Brief, p. 13; *United States v. Toney, supra* at 282.

proceedings (except in prosecutions for perjury or false swearing). After Portash's testimony, the parties tried to come to an agreement to avoid a criminal prosecution against Portash, but no bargain was reached. In April of 1975, Portash was indicted for misconduct in office and extortion by a public official.

*Id.* at 451–52, 99 S.Ct. at 1293 (footnotes omitted).

Before Portash's trial, defense counsel requested "a ruling from the trial judge that no use of immunized grand jury testimony would be permitted." Even though the trial court initially refused to rule that such testimony could not be used for impeachment purposes, the defendant renewed his motion after the state presented its case-in-chief. Thereupon, "the judge . . . ruled that, if . . . [the defendant] testified and gave an answer on direct or cross-examination which was materially inconsistent with his [immunized] grand jury testimony, the . . . [state] could use that testimony in" cross-examining him. Defense counsel represented to the Court "that, because of this ruling, he would advise his client not to take the stand." *Id.* at 452, 99 S.Ct. at 1294. Ultimately, just as his counsel had represented, Portash did not testify; and eventually he was convicted by the jury on some of the charges against him.

The Appellate Division of the Superior Court of New Jersey then "reversed the conviction and remanded the case for a new trial." *Id.* at 453, 99 S.Ct. at 1294. In turn, the United States Supreme Court affirmed this decision and held "that a person's testimony before a grand jury under a grant of immunity cannot constitutionally be used to impeach him when he is a defendant in a later criminal trial." *Id.* at 453–60, 99 S.Ct. at 1294–97 (footnote omitted). The Supreme Court did not specifically endorse the

New Jersey procedure, whereunder the defendant obtained review even though he had not taken the stand; in fact, two of the Justices expressed concern that "requiring that the claim be presented only by those who have taken the stand will prevent defendants with no real intention of testifying from creating artificial constitutional challenges to their convictions." *Id.* at 462, 99 S.Ct. at 1299 (Powell, J. concurring) (footnote omitted). However, obviously the Supreme Court did not consider that, under such circumstances, the issue posed by the ruling on a motion *in limine* is so speculative as not even to present a "case or controversy." *Id.* at 455–56, 99 S.Ct. at 1295.

Despite the developing case law which permits review of a ruling that a prior conviction will be admissible to impeach a defendant who then does not testify, appellate government counsel have strenuously urged that such a result would be inappropriate in cases like that at hand. They argue that, even if the appellant had testified, "it is quite possible that the summary court-martial conviction would have been admissible as rebuttal, rather than only as impeachment."[12] The Government also notes the procedural problems that derive from allowing review of such rulings on motions *in limine*—the most significant being uncertainty of whether the defendant is only seeking to establish a point for appeal and would not have testified even if the judge had ruled favorably on his motion.

■ We perceive considerable merit in the government's argument. Thus, in cases where motions *in limine* are made, even though "[a]dvance planning is in the best interest of the parties and of the judicial system," *see United States v. Fountain, supra* at 1087—a trial judge should be granted considerable discretion to defer rulings on motions *in limine.* Of course, in deciding

---

12. Government Answer to Final Brief, p. 10. It is not clear what would be "rebutted," unless appellant opened the door by testifying on direct examination that he had not been convicted. Moreover, even if the conviction were admissible for "rebuttal," that still would not mean that it could be considered for "impeachment" of the appellant's credibility. Presuma-

bly, the Government is suggesting that, if the record of prior conviction could be considered before findings for any purpose, then the appellant would not be prejudiced even though the court members erroneously believed that the conviction could be used in determining appellant's credibility.

whether to defer, the judge should consider the risk that a mistrial may ensue if subsequently the prosecution attempts to impeach an accused by use of a prior conviction or other evidence which is then held to be inadmissible. Likewise, the judge may properly consider the loss of time for busy—sometimes impatient—court members who must wait during the trial while he rules in an out-of-court hearing. Furthermore, the judge should have some reasonable assurance that the ruling will be decisive as to the accused's choice whether to take the stand. In that connection, he may seek to be advised as to the probable scope and content of the accused's proposed testimony.[13]

The trial judge must also remember "that the defendant's right to testify in his own behalf is a substantial right." *United States v. Fountain, supra* at 1088; *see* Mil. R.Evid 103; Fed.R.Evid. 103. Undoubtedly, many defendants are deterred from taking the stand by the well-founded fear that the prior convictions used to impeach their credibility will have a spillover effect in persuading the trier of fact of their guilt. Thus, if the judge concludes that a prior conviction will be inadmissible for impeachment purposes under any reasonably foreseeable circumstances, it seems appropriate that he so rule.[14]

■ The defense counsel's motion *in limine* was based on *United States v. Booker, supra*, and presented a pure issue of law which could be readily ruled on. Presuma-

bly the judge did not anticipate that some independent ground might render the prior conviction inadmissible, so that the issue posed by the defense would be mooted.[15] Therefore, he proceeded to rule. Since we find nothing in the record which refutes or calls into question the defense counsel's representation that Cofield would take the stand if the prior conviction were ruled inadmissible, we may properly review the issue raised by his ruling.

### III

At the time of Cofield's court-martial, the view of the majority then serving on this Court was that a summary court-martial could not be used for impeachment purposes. *United States v. Booker, supra.* In *Booker*, Chief Judge Fletcher observed that a summary court-martial was not a criminal conviction and therefore could not be used for impeachment. Furthermore, he wrote:

A related question concerns whether these hearings will be considered by this Court as convictions for the purposes of paragraph 153b(2)(b), Manual [for Courts-Martial, United States, 1969 (Revised edition)]; we feel that the reasons set forth above for concluding that the *Middendorf* [*v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976)] decision compels us to consider these as only disciplinary hearings rather than criminal proceedings similarly compels the conclusion that as such, evidence of the imposition of discipline at such a hearing does not constitute evidence of a conviction for the pur-

---

13. *See, e. g., United States v. Cook*, 608 F.2d 1175, 1186 (9th Cir.1979), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980), which establishes prerequisites to preserve the issue for review. The desire to avoid trial by ambush should operate in both directions; so it seems appropriate to ask that an accused who seeks to know in advance what the trial judge's ruling will be indicate in turn to the trial judge what his own testimony will be. *Cf.* the reciprocal discovery provisions of Fed.R.Crim.P. 16. We need not at this time consider what sanctions, if any, need to be employed if, after obtaining a favorable ruling on a motion *in limine*, the appellant does not take the stand.

14. We do not consider that a military judge is precluded from changing at a later time his

ruling that a prior conviction cannot be used for impeachment, but if he does so after the appellant has testified, obviously there would be a strong basis for urging that a mistrial should be granted upon defense motion.

15. A military judge may hesitate in ruling before trial or early in a trial that a prior conviction will be admissible for impeachment purposes because, when the conviction ultimately is offered in evidence, there will usually be an issue whether "the probative value of admitting this evidence outweighs its prejudicial effect to the accused," Mil.R.Evid. 609(a)(1); *see* Fed.R. Evid. 609(a)(1); and a proper resolution of this issue may be difficult until the judge has heard a substantial amount of evidence.

poses of impeachment. Examination of the relevant section of the Federal Rules of Evidence, Rule 609, further supports this conclusion. Other forms of impeachment and the use of character evidence under rules 404 and 608, should not come into consideration because of the requirements within the rules concerning probativeness and relevancy which discipline for minor military offenses would rarely, if ever, entail.

We, therefore, need not reach the defense contention that *Burgett v. Texas*, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), prohibits the use of such evidence, as we conclude that these hearings do not constitute criminal proceedings/convictions.

*Id.* at 244 n. 23.

More recently, the principal opinion in *United States v. Mack*, 9 M.J. 300 (C.M.A. 1980), made these comments about summary court-martial convictions:

> In *Burgett v. Texas*, [389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967),] the Supreme Court refused to allow impeachment of a criminal defendant testifying in his own behalf by proof of a prior conviction that had been obtained in violation of his constitutional right to the assistance of counsel. Since there is no constitutional right to counsel in a trial by summary court-martial, impeachment of an accused's testimony by evidence that he had been without counsel and had been convicted by summary court-martial of an offense involving moral turpitude, *see* para. 153*b*(2)(b), Manual, *supra*, would not present the same constitutional violation condemned in *Burgett*. However, in various cases on the right to counsel, the Supreme Court has emphasized its importance in assuring the accuracy of the fact-finding process; so there remains unanswered the question whether a summary court-martial conviction obtained without the presence of counsel for the

accused is reliable enough to allow its use for impeachment purposes.

*Id.* at 314.

\* \* \* \* \* \*

When a prior conviction is received in evidence, the parties have no opportunity to cross-examine the trier of fact who returned the finding of guilt as to the basis of his opinion that the defendant was guilty. That opinion is predicated on the testimony of witnesses who typically will not be subject to cross-examination at the trial where the prior conviction is being received. When that opinion of guilt was formed in a proceeding so informal that it does not constitute a "criminal prosecution" for purposes of the Sixth Amendment, its receipt in evidence to enhance the maximum punishment imposable or to impeach a witness' credibility seems questionable on due process grounds.

*Id.* at 315.

▮ Clearly, then, our precedents prohibited the use of summary courts-martial convictions to impeach an accused. Thus, the military judge's ruling on the appellant's motions was in error.[16]

### IV

As noted earlier in this opinion, a major objection to allowing a defendant who has not testified to obtain appellate review of an unfavorable ruling on a motion *in limine* is the difficulty in determining that he has been prejudiced. In the first place, there is no absolute guarantee that he would have taken the stand had the ruling been otherwise. Secondly, since it is often difficult to surmise what his testimony would have been, it may be sheer guesswork whether the accused's testimony would have tilted the scales to an acquittal.

Obviously, in some cases, the occasion to speculate will be less than in others. If, for example, an accused has testified at an Article 32 investigation or given extensive

---

**16.** Mil.R.Evid. 609(a)(1) now limits the prior convictions usable for impeachment in such a way that it is unlikely that many summary courts-martial convictions will be for offenses which allow their use for impeachment purposes.

pretrial statements, there is some reason to credit the assertion of his counsel that in like manner he would take the stand at trial if he could not be impeached by his prior convictions. Moreover, under such circumstances the contents of his expected testimony can be reasonably inferred. In turn, a fairly reliable conclusion can be drawn as to whether the testimony, if given, would have changed the result.[17]

Had defense counsel let matters stand after the judge ruled adversely on the initial motion *in limine*, we would be less inclined to rule that prejudice has been demonstrated because of uncertainty as to whether Cofield would have testified or what the contents of that testimony would have been.[18] However, after the direct examination of Private Tubbs had been completed, when defense counsel asked the military judge to reconsider the earlier ruling, the theory of the defense had become clear and there was every inducement for appellant to testify if he could not be impeached by the prior conviction.[19] Moreover, from the cross-examination of Colclough and from Tubbs' testimony on direct, it was evident what would be the general nature of Cofield's testimony. Since in several respects Tubbs had not been an especially persuasive witness,[20] testimony from appellant would not have been merely cumulative or repetitious. Indeed, in view of Colclough's earlier testimony as a government witness—which in several respects tended to substantiate defense contentions—it seems quite likely that Cofield could have turned the tide had he taken the stand without being subject to impeachment.

In sum, from our examination of the evidence, which in many respects was rather evenly balanced, we cannot be "sure that the error did not influence the jury, or had but very slight effect" nor can we "say, with fair assurance ... that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 764, 765, 66 S.Ct. 1239, 1247, 1248, 90 L.Ed. 1557 (1946). Therefore, we conclude that the erroneous ruling of the trial judge, which he declined to reconsider upon request by the defense, was prejudicial to the appellant.

IV

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judge FLETCHER concurs.

COOK, Judge (dissenting):

The United States Supreme Court in *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), based its holding strictly on the procedural rules of the state involved. It did not resolve the question of whether the failure of the defendant to testify would preclude an assertion on appeal that an evidentiary ruling at the trial level improperly infringed upon his right to testify. Indeed, two of the concurring Justices criticized the state rule, and two dissenting Justices held that the failure to testify was fatal to the accused's claim of reversible error. *Id.* at 462 (Powell, J., concurring), and 463 (Blackmun, J., dissenting). However, I need not now resolve the issue as I have previously expressed the view that a summary court-martial conviction

17. The issue is somewhat similar to that involved in determining whether newly discovered evidence, submitted in connection with a petition for new trial under Article 73, Uniform Code of Military Justice, 10 U.S.C. § 873, would have been likely to change the outcome.

18. The allied papers indicate that during the CID's pretrial investigation and the Article 32 investigation, appellant did not make any statement.

19. As mentioned earlier in this opinion, there is no reason to doubt the representation by defense counsel to the judge that his ruling about use of the prior conviction for impeachment was dissuading her client from testifying.

20. At one point it appears that because of his sniffing while he was testifying, the court members suspected that Tubbs might have been taking cocaine or some other drug shortly before he had taken the stand.

can be used for impeachment purposes. *See* my separate opinion in *United States v. Mack*, 9 M.J. 300, 326, 328 (C.M.A.1980), and my dissent in *United States v. Booker*, 5 M.J. 238, 244 (C.M.A.1977).

Here, the appellant was convicted by summary court-martial of the larceny of property of some value. That conviction could have been used for impeachment purposes, as provided by paragraph 153*b*(2)(b)(4), Manual for Courts-Martial, United States, 1969 (Revised edition), which was applicable on the date of appellant's trial. The recent amendments to the Manual, which took effect after appellant's trial, now provide:

(a) *General rule.* For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross-examination but only if the crime (1) was punishable by death, dishonorable discharge, or imprisonment in excess of one year under the law under which the witness was convicted, and the military judge determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused, or (2) involved dishonesty or false statement, regardless of the punishment. In determining whether a crime tried by court-martial was punishable by death, dishonorable discharge, or imprisonment in excess of one year, the maximum punishment prescribed by the President under Article 56 at the time of the conviction applies without regard to whether the case was tried by general, special, or summary court-martial.

Mil.R.Evid. 609(*a*). Although there is some question as to whether a larceny under $50.00 may now be admissible for the purpose in question because the maximum imposable punishment does not include a dishonorable discharge or exceed imprisonment for one year, the new rule does not totally restrict the use of summary courts-martial convictions for impeachment purposes. *See* Analysis of Mil.R.Evid. 609(*a*), Manual, *supra* Indeed, a conviction by a summary court-martial for larceny of a value exceeding $100.00 would be admissible for this purpose under the terms of Rule 609(a). *See* para. 127*c*, Manual, *supra*.

I would affirm the decision of the United States Army Court of Military Review.