**UNITED STATES**

v.

**Rodney M. JONES, 108 52 2836, Private (E-1), U.S. Marine Corps.**

**NCM 78 0737.**

U. S. Navy Court of Military Review.

Sentence Adjudged 9 Jan. 1978.

Decided 30 May 1979.

---

CAPT Allan H. Meltzer, USMCR, Appellate Defense Counsel.

LCDR Paul B. Thompson, JAGC, USN, Appellate Government Counsel.

Before DUNBAR, Senior Judge, and GREGORY and GLADIS, JJ.

DUNBAR, Senior Judge:

On 29 December 1977 and the 6th and 9th of January 1978, the appellant was tried by general court-martial at Camp Lejeune, North Carolina, for larceny of $471.00, in violation of Article 121 of the Uniform Code of Military Justice, 10 U.S.C. § 921, and for two periods of unauthorized absence, in violation of Article 86 of the Uniform Code of Military Justice, 10 U.S.C. § 886. Consistent with his plea to the larceny charge and contrary to his pleas with respect to the unauthorized absences, the appellant was found guilty, and a court consisting of members sentenced him to be discharged with a bad-conduct discharge, to be confined at hard labor for 2 years, and to forfeit all pay and allowances. On 7 April 1978 the convening authority approved the sentence as adjudged.

Trial defense counsel challenged the sufficiency of the larceny charge and its specification based on *United States v. Alef,* 3 M.J. 414 (C.M.A.1977). The military judge, without hearing argument, found *Alef* inapplicable to the situation and denied the motion. Trial defense counsel chose to abstain from similar motions regarding the remaining charges.

Appellant claims this Court should note that the specifications alleged were taken directly from Appendix 6 of the *Manual for Courts-Martial, United States, 1969* (Revised edition), and that even the staff judge advocate, well before trial, was aware the charges were defective.[1] Moreover, appellant alleges that the Government in this case, by failure to plead jurisdiction, did what the Court of Military Appeals specifically mandated against in *Alef.* He petitions that we set aside the findings and sentence and order a rehearing.

Appellant thus asserts that the United States Court of Military Appeals has made it a mandatory practice for the Government to affirmatively demonstrate jurisdiction over an accused and the alleged offenses through the sworn charges. He further alleges the Chief Judge of the High Court noted in the *Alef* opinion that the specification format set forth in Appendix 6 of the *Manual for Courts-Martial, United States,*

---

1. In his Article 34, UCMJ, 10 U.S.C. § 834, advice, the staff judge advocate advised the convening authority as follows:

    [I]t is further noted that the charges do not on their face allege that the subject named Marine is subject to the Uniform Code of Military Justice. It is recommended that the words "while on active duty" be inserted following the first "North Carolina" in each specification.

*1969* (Revised edition) does not present sufficient information to demonstrate military jurisdiction over an accused. Appellant states that the proper procedure proposed by the Court of Military Appeals to challenge such a specification is a "motion to quash." *United States v. Alef, supra,* at 419, n. 18.

It is difficult to comprehend any intelligent purpose for the addition of a new descriptive phrase to military justice terminology, *i. e.,* a "motion to quash," which is neither provided for in the *Manual for Courts-Martial, United States, 1969* (Revised edition) nor is encompassed within normal military practice. At any rate, it is worthy of note that the High Court seemingly regards this and other civilian practice nomenclature appearing in its recent decisions to be "valuable and elevating" to the military, quite apart from any definite function it may perform.[2]

In this connection, in *United States v. Rivera,* 6 M.J. 535 (N.C.M.R.1978), we expressed concern that a number of military lawyers appear relatively indifferent to the perpetuation of traditional military terminology, practices and procedures. Many have certainly taken to so-called "civilianization" of the United States military justice system like ducks to water. Yet the truth of the matter appears to be that this timorous and undisciplined spirit of conformism may be fraught with some serious problems.

A portion of the foreword in the 1978 fall issue of the Naval War College Review, by the President of the College, assist in putting the matter into focus. It states:

"That is to say that rational managerial concepts will cure all evils. The flaws of this viewpoint are brightly illuminated when it is applied to fighting forces— that's one of the things Vietnam proved. The loss of that war demonstrated that we cannot adopt the methodology of business without adopting its *language,* its style, its tactics and above all, its ethics. We must regain our bearings." [Emphasis supplied].

The precise point of interest here is, by the same token, *the military forces cannot adopt the language, thinking, and legalisms of the civilian legal sector without ultimately breaking down the fixed and accepted beliefs, values and distinctions which enable us, effectively and militarily, to relate our conduct to each other.* Nowhere is such an inevitable consequence more startlingly demonstrated than in the controversial *"Catlow-Russo"*[3] line of recruiter misconduct cases, which rationalized and degenerated the concept of honorable military service into a legalistic and technical civilian issue of contractual infirmity, based upon cases such as *Marshall v. Baltimore and Ohio R. Co.,* 57 U.S. (16 Howard) 314, 14 L.Ed. 953 (1853), and enlistment contract principles "intimated" in the case of *In re Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890).

*Marshall* and *Grimley* also provided the basis for a series of Court of Military Appeals opinions which established a narrow and closed system of legal thinking pertaining to what the High Court described as the "phenomenon known as enlistment." It can be stated, without fear of contradiction, that careful examination of this series of cases confounded a large number of persons in the military-legal community. Many could not avoid being perplexed by certain references cited by the High Court in support of its rationale relating to enlistment contracts, such as, "Shedd, *The Christian Doctrine, Force and Effect of Law, and Effect of Illegality on Government Contracts,* 9 Public Contracts, L.J. 1–31 (June 1977)", as well as *"United States v. Standard Oil Co.,* 332 U.S. 301, 305, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947)."[4]

---

2. "Motions to quash" have been abolished as instruments of trial procedure in Federal Courts. Fed.R.Crim.P. 12(a), as amended April 22, 1974, effective December 1, 1975, Pub.L. No. 94–64, Sec. 3(11), (12), 89 Stat. 372 (1975).

3. *United States v. Catlow,* 23 U.S.C.M.A. 142, 48 C.M.R. 758 (1974); *United States v. Russo,* 1 M.J. 134 (C.M.A.1975).

4. *United States v. Valadez,* 5 M.J. 470, nn. 6 and 9 (C.M.A.1978).

The Court of Military Appeals used the following language in *Alef, supra,* 3 M.J. at 418:

[T]he specification format currently utilized simply does not present sufficient information to demonstrate military jurisdiction; as should be readily apparent from Part I of this opinion, far more jurisdictional data is required than that presently given—the name of the defendant, his rank or military status, the date and situs of the offense, and the nature of the offense. Unlike its civilian counterpart, jurisdiction in military tribunals requires a case-by-case analysis utilizing a balancing test of the 12 Relford criteria as opposed to a simple application of set statutory criteria. In the absence of such indictment, the defense is not truly on notice of what jurisdictional basis, if any, the government is urging, and this, in no small part, has contributed to the scant (even non-existent) evidence which is the product of the current motion practice. The better practice, and the one we now make mandatory, is the government affirmatively to demonstrate through sworn charges/indictment, the jurisdictional basis for trial of the accused and his offenses. Development of this type of trial practice should ensure that military tribunals will be presented with sufficient evidence to resolve service-connection issues utilizing the approach set forth in Part I of this opinion.

This Court has reviewed numerous records of trial where compliance with the foregoing heterogeneous requirements has been attempted by a variety of methods. Jurisdiction has been pleaded in footnotes inserted at the bottom of the charge sheet; charge sheets have been received with copies of enlistment contracts or "Affidavits of Jurisdiction" signed by commanding officers stapled to them; charge sheets have contained introductory paragraphs captioned "Jurisdictional Declaration"; and specifications have been drafted with such a plethora of jurisdictional information that the offense alleged is almost lost in factual and circumstantial data.

It should not be necessary for military justice to function on a muddle-through, put-it-over, or heroic can-do basis merely because of an arbitrary decision requiring capitulation of the unique military justice system to novel innovations in pleading, as well as civilian rules and procedures.[5] And in *Alef,* to make the matter more enigmatic, a system of pleading utilized since the inception of the UCMJ, derived from the Federal civilian courts, was supplanted as being inadequate. A civilian system saddled with the rule of *Alef* would suffer the same confusion and partial paralysis which infects the military justice system since *Alef.* We cannot help but believe that a justice system, or any military mission, functioning on such a basis is not only steaming under false colors but is also courting serious implications in the event of a partial or total military mobilization. Somewhere down the line we will have to pay a price.

Accordingly, the High Court is urged to institute efforts to halt so-called "civilianization" and to reintegrate the body of military justice by reevaluation and modification of controversial decisions and doctrines in a manner which brings them back into balance with the traditional and militarily oriented thinking of the majority of those experienced in military affairs.[6]

---

5. . . . "[T]he burden of showing that military conditions require a different rule than that prevailing in the civilian community is upon the party arguing for a different rule." *Courtney v. Williams,* 1 M.J. 267, 270 (C.M.A. 1976).

6. In *United States v. Onate,* 6 M.J. 985, 988–989 (N.C.M.R.1979), Lieutenant Colonel Granger, of this Court, addresses the confusion of tongues arising from so-called "civilianization" as follows:

. . . Procrustean efforts to fit the military justice system into the mold of civilian systems provide more diversion than insight, and tend to confuse the issue. . . . I cannot accept appellate defense counsel's conclusion that the staff judge advocate's office is the military equivalent of a civilian district attorney's office. . . . The staff judge advocate is no more nor less the chief prosecutor than he is the chief defense counsel, or the chief court reporter, or the chief

In this respect, legal documents filed in connection with a recent case before this Court, *United States v. Acosta,* 6 M.J. 992 (N.C.M.R.1979), offer another striking portrayal of the debilitation of sound military-legal thinking which so-called "civilianization" of the United States military justice system has dictated. There, we see the historic, traditional, and fundamental authority of the military commander over his personnel debased to a type of civilian technical issue, exactly as in the *"Catlow-Russo"* cases, and analogized to the conduct and determinations of civilian magistrates and even municipal clerks.

We should protest strongly such innovative theorizing. We cannot allow military realities to be thrown out of perspective. The healthy realism and objectivity of military thinking must be preserved. Military law must be based and formulated upon the application of legal reasoning to the mutual adjustments, and maladjustments, in which military personnel participate as a distinct and unique class. The facts of experience, realized from these mutual adjustments, have enabled the military establishment, by Congressional adoption of a separate and unique system of military justice, to formulate its own body of beliefs, values and outlooks—its own code of right and wrong, separate and distinct from the civilian sector. There is a Constitutional basis for this Congressional action. Article I, Section 8, of the United States Constitution, provides Congress shall have the power ". . . To make Rules for the Government and Regulation of the land and naval Forces." These rules demand that the powers and authority of commanding officers, whether company commanders or division commanders, be preserved and not be judicially

weakened and minimized. *For, it is only through rightly exercised power, authority and example that the military commander acquires the respect, obedience and loyalty of the members of his command.*

But, it has been stated that, in light of Court of Military Appeals decisions, many commanders are uncertain as to their powers and authority. This is an excellent reason why pseudo-rational legal efforts to draw peculiar analogies from the roles of military commanders to civilian magistrates and municipal clerks must be vigorously protested and rejected by this Court. The principal objectives and responsibilities of military commanders are alien to these civilian officials. In my opinion, irresponsible thinking along these lines, if allowed to flourish, can eventually do serious harm to the military establishment. Independent military thinking must take over in these circumstances, while many come to the realization that Court of Military Appeals' opinions are mere instruments, not ends in themselves. Their function should be to steer the appellate courts in accordance with the High Court's policies. When, however, those opinions or policies do not interfuse properly or are inconsistent with the superior hierarchy of recognized and accepted military values, professionally-staffed judgments, traditions and customs, then it is the statutory responsibility of the lower appellate courts to make a stand and defend their system against those who would ill-advisedly break it down with a new judicial ideology.

In *United States v. Ezell,* 6 M.J. 307 (C.M.A.1979), the Court of Military Appeals continued the military commander/civil magistrate dichotomy.[7] Additionally, and

---

clerk. . . . Those interested in defining the court-martial duties of the staff judge advocate could more profitably abandon analogies with civilian practice and instead study the Uniform Code of Military Justice . . . . Those who simply cannot accept the fact that the military justice system is unique, however, and who wring their hands when unable to anchor their military justice concepts in civilian practice, might be comforted and would not be misled by . . .

comparisons in *Morrison* [*United States v. Morrison,* 3 M.J. 408 (C.M.A.1977)] to the effect that the staff judge advocate is, for all practical purposes, the chief counsel for the command.

7. In three opinions, 30 pages, 20 headnotes and numerous civil law legal citations, military commanders are instructed and indoctrinated concerning their "warrant functions" respecting search and seizure within their commands. The concurring opinion of the Chief Judge also

much more significantly, the concurring opinion stated, "It is essential for this Court to keep pace with the constitutional evolution of the military justice system fashioned by the Supreme Court and the emerging realities of life in the modern military community." Such rhetoric cannot help but suggest a kind of grand historical pageant, with the military marching forward to the "great day" which is to come as the culmination of a process of constitutional military-legal evolution, somehow reminiscent of antiquated and romantic notions of revolutionary economic evolution.

Furthermore, by claiming that the Supreme Court is fashioning "military justice evolution," the Court of Military Appeals is, in effect, attributing responsibility for the legality of its own acts upon the Supreme Court. Yet, the claim of the Court of Military Appeals, that the Supreme Court is fashioning the constitutional evolution of military justice, appears completely at odds with the language of the United States Supreme Court in cases such as *Burns v. Wilson*,[8]:

> Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress.[9]

Indeed, more consistent with the actual intent of the Supreme Court is the incisive observation of Judge Tamm, United States Court of Appeals for the District of Columbia Circuit, in the recent case of *Curry v.*

makes it clear that, because of the "emerging facts of military life," commanders and commanding officers will eventually be stripped of search and seizure authority which will become the responsibility of military judges and magistrates.

*Secretary of the Army,* 194 U.S.App.D.C. ——, 595 F.2d 873 (1979): "The need for national defense mandates an armed force whose discipline and readiness is not unnecessarily undermined by the often deliberately cumbersome concepts of civilian jurisprudence."

This Court has been vocal and persistent in its opposition to the High Court's unauthorized dismantling of the unique structure of military justice. In *United States v. Rivera, supra,* we emphasized the statutory responsibility of the service courts to preserve the integrity of the system by vigorously protesting questionable decisions. That integrity has been damaged. A divided High Court, divided service courts, divided panels within those courts, accompanied by proposals to abolish the High Court, make it impossible to refuse to acknowledge the hard reality of the situation.

Some do not find it difficult to liken present military justice to a warship proceeding at flank speed along the coast of San Diego, off course in thick fog, with no one on the bridge, helm or engine order telegraph. No doubt the situation is particularly disconcerting and irksome to many because it resists correction by some instruments of current patent-medicine methodology, i. e., it cannot be ignored, denied, waited-out, contracted-out, analyzed, politicized, or manipulated with contemporary public relations techniques and propaganda.

Therefore, we must candidly face up to the fact that the problem must be met head-on, intellectually, by the service appellate courts. In our opinion, such courts are fully competent to grasp the significance and implications of the situation as a whole, distinguish the genuine from the imitation, and lead the system back on a militarily oriented course compatible with the existence of an effective military arm.

8. *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

9. *Id.* at 140, 73 S.Ct. at 1047–1048.

It is not intended that this opinion be interpreted as questioning the integrity or sincerity of a particular member or members of the Court of Military Appeals. Yet it cannot be denied that many of the pronounced doctrines and policies being formulated by the High Court are in serious logical conflict with the outlook in general of the military and the Congressional legislative history of the UCMJ. It should not be necessary to embark upon an extended analysis of pertinent cases.

Reduced to its simplest terms, the central issue in this controversy is the continuing and somewhat successful effort of the High Court to transform and "civilianize" the unique nature of military justice, its words and terms, practices, procedures and substantive law. In other words, its militaristic character. Much of this has been accomplished by intellectual fabrications which render plausible and give specious explanation or justification to abstract theories, innovative military-legal doctrines and rigmarole which many persons in the military find difficult, if not impossible, to accept. This trend appears to continue, unabated.

Squarely in the vanguard of this effort, as paramount examples, are the "Catlow-Russo" line of cases, where quasi -legal systems of thought were constructed with little or no sense of their connection with and impact upon the realities of military life. We should also include *United States v. King,* 3 M.J. 458 (C.M.A.1977), which elevated inflexible form over substance, *United States v. Alef, supra,* and *United States v. Booker,* 5 M.J. 238 (C.M.A.1977), which attempted to judicially legislate away the true status and nature of the summary court-martial as defined by Congress in the Uniform Code of Military Justice and confirmed by the Supreme Court of the United States in *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976).

The concepts of "civilianization" or "judicialization" of military justice are not new. They have occupied the scholarly daydreams of certain civilian and military legal writers, on a by-the-case/by-the-citation level, since the civil war.[10]

■ Nevertheless, the evidence appears unmistakable that military leadership cannot be isolated from the powers and authority which military law has heretofore reposed in commanders and commanding officers. *From a military standpoint, the entire crux of the matter is that those in command and control of combat forces must have an authoritative say in the administration of a tough, fair, efficient and comprehensible military justice system if they are to continue to perform their missions with the daring, initiative and effectiveness, to which they are held accountable.* And no one can deny that American fighting units, of all types, besieged or besieging, have proven themselves second to none in executing their missions.[11]

Consequently, we think it may be stated, fairly, that "civilianization" constitutes a kind of unwarranted and unauthorized reorientation, a new and unverified way of looking at military matters, one which might very possibly do subtle and irreparable harm to the militaristic spirit and ideals of our Armed Forces whose traditional heroism, reliability and proven effectiveness should not be capriciously tampered with.

With regard to this case, the *Manual* pleading techniques and practices which have been tested, proven, and relied upon, should not be abrogated in the absence of clearly enunciated reasons. *Alef* does not adequately furnish such reasons. Instead, it sets forth broad generalizations without regard to the ends they serve or their practical application and functioning in military justice.

---

10. *See* E. F. Sherman, *The Civilization of Military Law,* 22 Maine L.Rev. 3 (1970).

11. "Hitler had decreed that Bastogne be taken *at any cost.* He could not understand that even the *elite* divisions of the SS could not effortlessly overrun the *Americans.* It was impossible to convince Hitler that these were *tough opponents,* soldiers as good as our own men." [Emphasis supplied.] Albert Speer, INSIDE THE THIRD REICH, Chapter 28.

In our opinion, the pleadings, testimony and other evidence of record show clearly the subject matter jurisdictional basis for the trial of the appellant. The specifications are drafted pursuant to the specimen forms provided in Appendix 6 of the *Manual*. Those forms have not been legally revoked or invalidated and their utilization in this case sufficiently apprised the accused of the specific wrongdoing he was alleged to have committed. The findings and sentence as approved on review below are affirmed.

Judge GREGORY concurs.

GLADIS, Judge (concurring in the result):

I concur in the result reached by the majority because I find, for the reasons set forth below, that, contrary to the contentions of the accused, the specifications meet the pleading requirements of *United States v. Alef*, 3 M.J. 414 (C.M.A.1977). In addition, insofar as the attempts to remold the military justice system are contrary to and undermine the clearly expressed intent of Congress, acting pursuant to its constitutional authority, I join my brothers in condemning those attempts.

### Sufficiency of the Specifications

A general court-martial with officer members convicted the accused, in accordance with his pleas, of larceny in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921, and, contrary to his pleas, of two unauthorized absences in violation of Article 86, UCMJ, 10 U.S.C. § 886. The convening authority approved the sentence, which consists of a bad-conduct discharge, confinement at hard labor for 2 years, and total forfeitures.

Among other things, the accused contends on appeal that the Government failed to demonstrate affirmatively, through the sworn charges, the jurisdictional basis for

trial of the accused and his offenses. *See United States v. Alef, supra.* I cannot agree. The unauthorized absence specifications in this case allege that the accused, a private in the U. S. Marine Corps, absented himself from his named unit on or about the dates specified until the dates specified. The larceny specification alleges that the accused, a private in the U. S. Marine Corps,[1] did at Marine Corps Base, Camp Lejeune, North Carolina, steal a specified amount from a named victim on a specified date. *United States v. Alef, supra*, requires that the Government affirmatively demonstrate through sworn charges/indictment the jurisdictional basis for trial of the accused and his offenses. An indictment is sufficient if the necessary facts appear in any form or by fair construction can be found within the terms of the specifications. *Cf. United States v. Sell*, 3 U.S.C. M.A. 202, 206, 11 C.M.R. 202, 206 (1953). I recognize, as observed by Senior Judge Dunbar, that *Alef* has engendered confusion throughout the military legal community as to its meaning and extent. *See United States v. Blake*, 6 M.J. 690 (N.C.M. R.1978). Nevertheless, the specifications in this case satisfy the *Alef* pleading requirements. A specification setting forth the rank or rating and military unit of the accused, and stating that he is in the U. S. Marine Corps or Navy, is sufficient to allege jurisdiction over the person of the accused.[2] Such a specification alleges by fair implication that the accused has been properly enlisted and is on active duty. A specification stating that the accused committed an offense on a military base is sufficient to allege subject-matter jurisdiction.[3] *See Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971) (An offense committed by a service member on post is service connected and subject to court-martial jurisdiction).

A specification alleging unauthorized absence or a purely military offense pleads

---

1. The unit of the accused is also alleged.

2. *Accord United States v. Moran*, No. 78 1374 (N.C.M.R 13 March 1979) (unpublished).

3. An allegation of an off-base situs is not, standing alone, sufficient to meet the requirement of *Alef* to plead subject-matter jurisdiction.

subject matter jurisdiction by fair implication. Thus, the specifications in this case demonstrate the jurisdictional basis for the trial of the accused and his offenses. The remaining assignments of error also lack merit. Therefore, I concur in the result.

*Revision of the Military Justice System*

I join the majority in criticizing improper and ill-considered attempts to remold the military justice system in the civilian image. In my opinion, however, the majority's attack on civilian legal procedures and values is too broad. We must not reject those values which are legitimately a part of the existing system. Our unique military justice system is the product of a blend of civilian legal and military values and procedures melded to achieve a delicate balance between the need for a strong and well-disciplined military organization and the rights of its individual members. Military justice has moved toward a closer approximation of the procedures and assimilation of the values of civilian criminal legal systems for more than half a century. Cooke, *The U. S. Court of Military Appeals, 1975–1977: Judicializing the Military Justice System,* 76 Mil.L.Rev. 43, 45 (1977). *See* Sherman, *The Civilianization of Military Law,* 22 Maine L.Rev. 3 (1970). In the exercise of its constitutional authority to make rules for the Government of the land and naval forces, in enacting the Uniform Code of Military Justice and the Military Justice Act of 1968, Congress has included certain civilian legal values and procedures in the military justice system and rejected others. *See* Sherman, *supra* at 31–59. Congress has recognized the requirement of civilian society for a strong and well-disciplined military organization to protect and defend it and has carefully balanced this need against the rights of the individual member of the Armed Forces. Congress gave the President the power to prescribe procedural rules and cast the commander in an important role. It fashioned a unique system of military justice which incorporates some, but not all, facets of the civilian system. It also gave the individual rights unknown in the civilian system. *See* Moy-

er, *Procedural Rights of the Military Accused: Advantages Over a Civilian Defendant,* 22 Maine L.Rev. 105 (1970). Attempts to improve military justice by adopting civilian procedures rejected by Congress upset the delicate balance Congress has achieved between the requirement for a strong military organization and the rights of its individual members. Disregard for the constitutional enactments of Congress breeds contempt for the rule of law. Congress intended and provided that the President promulgate procedural rules, Article 36, Uniform Code of Military Justice. It did not authorize the Court of Military Appeals to amend the Uniform Code of Military Justice or the procedural rules promulgated by the President by adopting new procedures considered by the Court to better approximate civilian values and to be an improvement upon the existing military justice system. The Court of Military Appeals plays an important role in the system. As the Supreme Court noted:

> . . . The military is "a specialized society separate from civilian society" with "laws and traditions of its own [developed] during its long history." *Parker v. Levy,* 417 U.S. [733], at 743, 94 S.Ct. [2547] at 2555 [41 L.Ed.2d 439.] Moreover, "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise," *Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past. Their contemporary vitality repeatedly has been recognized by Congress.

In enacting the Code, Congress attempted to balance these military necessities against the equally significant interest of ensuring fairness to servicemen charged with military offenses, and to formulate a mechanism by which these often competing interests can be [420

U.S. 758] adjusted. As a result, Congress created an integrated system of military courts and review procedures, a critical element of which is the Court of Military Appeals consisting of civilian judges "completely removed from all military influence or persuasion," who would gain over time thorough familiarity with military problems. See *Noyd v. Bond,* 395 U.S. [683], at 694–695, 89 S.Ct. [1876], at 1882–1883 [23 L.Ed.2d 631].

*Schlesinger v. Councilman,* 420 U.S. 738, 757–58, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591, 608–9 (1975).

But Congress provided that the Court of Military Appeals recommend amendments to the Uniform Code of Military Justice, not that the Court amend the Code. Article 67 *g,* UCMJ, 10 U.S.C. § 867(g). The rightful roles of the President and the commander cannot be ignored without upsetting the balance achieved by Congress. Each participant in the system must work to effectuate the intent of Congress, not to thwart it and undermine the system by ignoring the Congressional mandate. The Court of Military Appeals is ill-equipped for, and inept at, legislating. This is amply illustrated by the confusion and uncertainty engendered by the *Alef* decision. Patchwork rules extracted from three-opinion decisions are no substitute for comprehensive procedural rules carefully considered and properly staffed before promulgation. *See e. g. United States v. Ezell,* 6 M.J. 307 (C.M.A.1979); *United States v. Heard,* 3 M.J. 14 (C.M.A. 1977); *United States v. Thomas,* 1 M.J. 397 (C.M.A.1976).

Therefore, I join the majority in urging the military High Court to reconsider the decisions which upset the delicate balance struck by Congress between the requirement for a strong military organization and the rights of the individual service member.