Penny L. ZELLERS, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–550.

District of Columbia Court of Appeals.

Argued Oct. 17, 1995.
Decided Aug. 12, 1996.

William S. Rhyne, McLean, VA, appointed by the court, for appellant.

Kristan L. Peters–Hamlin, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Robert A. De La Cruz, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN, TERRY, and REID, Associate Judges.

TERRY, Associate Judge:

Appellant was tried on an indictment charging second-degree burglary [1] and first-degree theft.[2] The evidence showed that she had crawled through an open window and taken a television set, a microwave oven, and several compact discs from the complainant's residence at a military base. The jury found appellant guilty of first-degree theft and also found her guilty of unlawful entry,[3] a lesser included offense of second-degree burglary. A few weeks later she was given a suspended sentence on each count and placed on probation for a total of three years, with 280 hours of community service.

1. D.C.Code § 22–1801(b) (1996).

2. D.C.Code § 22–3812(a) (1996).

3. D.C.Code § 22–3102 (1996).

Before this court appellant challenges the theft conviction, *arguing that the government* presented insufficient evidence to establish that the value of the stolen property was at least $250, as required for first-degree theft.[4] She also contends that the trial court erred in refusing to allow the complainant to be impeached with a summary court-martial conviction. We hold that the evidence offered by the government (appellant presented none) was insufficient to prove that the value of the stolen goods met the $250 statutory requirement. We also hold that a summary court-martial conviction may not be used to impeach a witness under D.C.Code § 14–305(b) (1995). Accordingly, we affirm in part and reverse in part.

## I

In the summer of 1991, Lance Corporal Jeffrey Velilla was on active duty with the Marine Corps and was living in base housing at Fort Bellevue Naval and Marine Corps Base, adjacent to Bolling Air Force Base in the District of Columbia. He spent part of the Fourth of July weekend at Virginia Beach, Virginia, about 200 miles from Washington. When he returned to the base on Monday afternoon, July 8, he found that his house had been broken into and that his television set, his microwave oven, and all of his compact discs (CDs), about thirty-five or forty of them, were gone. He immediately reported the break-in to the Naval Investigative Service (NIS), and NIS agents came to his home to take a report and dust for fingerprints.

Appellant Zellers, the wife of another Marine, was Corporal Velilla's neighbor.[5] On Sunday, July 7, when she learned that Velilla was away at the beach, she decided to break into his house and steal a few things. After enlisting the aid of another neighbor, Selena Sanchez, Ms. Zellers entered Velilla's house through the front window[6] while Ms. Sanchez waited outside. Zellers then passed the television set and the other items through the window to Sanchez, who carried them to Zellers' house. Afterwards the two women put all the stolen items in Zellers' car, and the next day they took them to a pawn shop in suburban Virginia. The proprietor of the pawn shop paid Zellers $50 for the television set, $10 for the microwave, and $70 for the compact discs.

Later that day, when Ms. Zellers saw the NIS agents dusting Velilla's house for fingerprints, she became anxious that she might be considered a suspect. She remembered that the pawnbroker had taken down information from her driver's license and feared that the pawned articles could be traced back to her. Ms. Zellers and Ms. Sanchez went once again to the pawn shop and tried to buy everything back. They had to pay $100 for the television and the microwave, however, and as a result they did not have enough money to redeem the CDs as well. The two women took the television and the microwave to a friend's house and left them there for a couple of days.

On Thursday, July 11, Ms. Zellers called Corporal Velilla and asked him to come to her house. When he arrived, she told him that she was the one who had burglarized his house, that she was sorry, and that he would get his property back. Velilla left and called one of the NIS agents to report that Zellers had confessed to the burglary. The next day, July 12, Velilla found the television set and the microwave sitting outside on his doorstep. Some time later Zellers called him again and said that she would not be able to return his CDs, but that she would instead give him a gun that she owned. They arranged to meet, and at that meeting Zellers gave Velilla a .38 caliber pistol as compensation for the CDs. Velilla again called NIS and reported what had happened.

Finally, on July 15, Ms. Zellers gave a written statement to an NIS agent. In it she

---

4. First-degree theft is theft of property with a value of $250 or more. D.C.Code § 22–3812(a). If the value is less than $250, the crime is second-degree theft. D.C.Code § 22–3812(b).

5. Appellant gave a written statement to an NIS agent. Our summary of her actions is based mainly on that statement, which was introduced into evidence at trial and is part of the record on appeal.

6. Appellant had noticed earlier that Velilla had left his windows open.

admitted the burglary and said that she had stolen Corporal Velilla's property because she needed money. From her statement the NIS was able to locate the pawn shop, and there an agent found some, but not all, of the missing CDs.

Corporal Velilla testified that he had purchased the CDs for approximately $15 each, at various times ranging from a few months to a little more than a year before the theft. He also said that the television set was less than two years old when it was stolen. The government introduced into evidence the original receipt, dated October 13, 1989, which showed that the purchase price of the television set was $640. Velilla also said that he had bought the microwave oven for $99; another receipt, dated October 18, 1988, corroborated his testimony and established the date of purchase. Photographs of the television set, the microwave, and the recovered CDs were introduced into evidence, along with the two receipts. In sum, the evidence produced by the government showed that all of the items stolen had been purchased by Velilla, at various times, for a total price of $1,339.

Appellant presented no evidence.

## II

■ At the close of the government's case, defense counsel moved for a partial judgment of acquittal, arguing that the government had failed to prove that the value of the stolen items was $250 or more. The court denied the motion. Appellant now contends that this ruling was error and urges us to remand the case with directions to reduce her conviction to second-degree theft, a misdemeanor with a maximum penalty of 180 days in jail. *See* D.C.Code § 22–3812(b).[7]

■ When the value of property is at issue in a criminal case, there are different methods of proving value,[8] and no one method is preferred over others. Although expert testimony is admissible and in some cases may be sufficient without additional proof, we

have refused to require expert testimony to establish value. *In re R.D.J.,* 348 A.2d 301, 304 (D.C.1975). We have also held expressly that "[t]he market value of a chattel ... may be established by the testimony of its non-expert owner." *Saunders v. United States,* 317 A.2d 867, 868 (D.C.1974) (citation omitted). Our case law reflects these principles. We have held, for example, that the testimony of the owner that the purchase price of the stolen goods was more than five times the statutory minimum, "the fact of their very recent purchase and mint condition at the time of the theft," and the fact that "two of the stolen items, a .38 caliber pistol and a camera, are not items of prompt depreciation or obsolescence" were sufficient to prove value in a prosecution for grand larceny (the statutory predecessor of what is now first-degree theft). *In re J.F.T.,* 320 A.2d 322, 325 (D.C.1974). Likewise, we affirmed a conviction of receiving stolen property of a value of $250 or more when the property was a Ford automobile of "recent vintage" and fully operable, but the only other evidence relevant to the issue of value was a series of photographs which showed that the vehicle was in good condition. *Curtis v. United States,* 611 A.2d 51, 52 (D.C.1992).

On the other hand, we have reversed a grand larceny conviction when the only evidence of value was testimony that the stolen item, a television set, was purchased "approximately fourteen to fifteen months prior to the crime for $300 to $400 and that, when stolen, it was in 'almost mint' condition and worked well." *Moore v. United States,* 388 A.2d 889, 891 (D.C.1978). We also reversed a grand larceny conviction when the only evidence of value was the owner's testimony that his stolen golf clubs had cost $312 and "that, at present, he could get at least $50 for [them]," coupled with "the physical presence" of the golf clubs in court. *Boone v. United States,* 296 A.2d 449, 450 (D.C.1972). *See also Eldridge v. United States, supra* note 8, 492 A.2d at 883 (testimony by store detective as to price marked on price tags of stolen merchandise "was incompetent to prove the

---

7. First-degree theft is a felony with a maximum prison sentence of ten years. D.C.Code § 22–3812(a).

8. "[V]alue in this context means the fair market value of the property." *Eldridge v. United States,* 492 A.2d 879, 882 (D.C.1985) (citations omitted).

value of the merchandise to which those tags were attached"); *United States v. Thweatt,* 140 U.S.App. D.C. 120, 126–127, 433 F.2d 1226, 1232–1233 (1970) (testimony of owner stating purchase price of stolen clothing was insufficient to prove value when clothing was old and worn, and some of it had been patched and repaired).

■ The principle underlying all of these cases is the same: that the evidence must be "sufficient to eliminate the possibility" that the jury's verdict was "based on surmise or conjecture" about the value of the property. *Boone, supra,* 296 A.2d at 450; *see United States v. Wilson,* 284 F.2d 407, 408 (4th Cir.1960). But we have been very strict in requiring affirmative proof of value, especially when the value alleged is close to the line dividing one offense from another:

> We have noted recently a continuing indication of failure in governmental proof sufficient to establish a felony rather than a misdemeanor in larceny cases of this nature. Because of the important difference between a misdemeanor and a felony conviction, this court has been careful to require substantial probative evidence of value at the time of the theft.

*Williams v. United States,* 376 A.2d 442, 444 n. 3 (D.C.1977). Although we made these comments almost twenty years ago, the case at bar illustrates that the need for clear proof of value is still a matter of concern.

In this case, the fact that the pawnbroker paid $130 for all the stolen items would support a finding that their value was at least that amount. The photographs established, moreover, that the goods were in good condition when they were recovered after the theft. The owner testified, here as in *In re J.F.T., supra,* that the purchase price of all the stolen articles was more than five times the statutory minimum. But the television set was almost two years old, and the microwave was a year older. We reversed a grand larceny conviction in *Moore, supra,* when the only evidence of value was that the stolen television set, which "was in 'almost mint'

condition and worked well," had been purchased for $400 fifteen months before the theft. 388 A.2d at 891. In the case at bar, at least as far as the television set is concerned, the evidence is comparably inadequate, even when viewed, as it must be, in the light most favorable to the government.[9] The fact that the television set originally cost $640 would not prove that its value at the time of the theft, twenty-one months later, was $250 or more, even if it was in "almost mint" condition. The microwave oven was a year older than the television set and cost only $99 when new; hence its value was probably not great. If the only items stolen were the television set and the microwave, we would not hesitate to reverse, as we did in *Moore,* for insufficient proof of value. *See Terrell v. United States,* 361 A.2d 207, 211 (D.C.), *cert. denied,* 429 U.S. 984, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976) (reversing when evidence of value presented "a close question").

To get past the $250 hurdle, the government must rely on the forty compact discs,[10] which Corporal Velilla purchased at various times over a period of a year or so before the theft. The parties have not cited, and we have not found, any cases dealing with compact discs. On the one hand, they are not electrical appliances like the television set and the microwave, subject to everyday wear and tear. In this respect they are more like the pistol and camera in *In re J.F.T., supra,* which we said were "not items of prompt depreciation or obsolescence...." 320 A.2d at 325 (footnote omitted). On the other hand, the value of any compact disc or other musical recording depends in large part on what is recorded. Thus, for example, a CD containing a collection of arias sung by Enrico Caruso, who has been dead for seventy-five years, may be of greater value than an album of musical ephemera sung by yesterday's rock star *du jour.* The government presented no evidence whatever, beyond Corporal Velilla's testimony about the purchase price, that tended to show the value of

---

9. *See Curtis v. United States, supra,* 611 A.2d at 52; *Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991) (citing cases).

10. Viewed in the light most favorable to the government, Velilla's testimony established that forty CDs were stolen and that they had each cost $15, for a total purchase price of $600.

the CDs. Purchase price is not necessarily equivalent to value, and we cannot assume that the compact discs retained the value that they had at the time of their purchase. More fundamentally, we are not in a position (nor was the trial court) to take judicial notice of what may affect the value of a compact disc. Given this failure of proof, and considering that the total value of the stolen goods was "a close question," *Terrell, supra,* 361 A.2d at 211, we hold that the evidence was not "sufficient to eliminate the possibility" that the verdict was "based on surmise or conjecture." *Boone, supra,* 296 A.2d at 450. Thus we must reverse the first-degree theft conviction and direct that it be reduced to second-degree theft.[11]

### III

The Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 801–946 (1994), governs court-martial proceedings in all branches of the armed services. Under the UCMJ, there are four ways of dealing with offenses committed by military and naval personnel. The general court-martial under Article 18 of the UCMJ (10 U.S.C. § 818) and the special court-martial under Article 19 (10 U.S.C. § 819) are formal, adversarial criminal proceedings. The summary court-martial under Article 20 (10 U.S.C. § 820) and non-judicial punishment by a commanding officer under Article 15 (10 U.S.C. § 815), however, are non-adversarial proceedings and provide fewer procedural safeguards to an accused. In a summary court-martial, a commissioned officer presides, "act[ing] as judge, factfinder, prosecutor and defense counsel." *Middendorf v. Henry,* 425 U.S. 25, 32, 96 S.Ct. 1281, 1286, 47 L.Ed.2d 556 (1976). While the presumption of innocence and the requirement that guilt be proved beyond a reasonable doubt attach to both the general and special court-martial, no such rules apply in a summary court-martial. *See* 10 U.S.C. § 851(c)(1)-(4).

A defendant in the military justice system has an incentive to elect a summary court-martial, because such an election will enable the defendant to avoid such harsh penalties as a dishonorable or bad-conduct discharge, confinement for more than one month, or forfeiture of more than two-thirds of a month's pay. 10 U.S.C. § 820. Nevertheless, a summary court-martial may not be convened over the defendant's objection. If a defendant objects to adjudication by summary court-martial, trial may be ordered by special or general court-martial, as appropriate. *Id.*

> D.C.Code § 14–305(b)(1) provides in part: [F]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted if offered, either upon the cross-examination of the witness or by evidence aliunde, but only if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (B) involved dishonesty or false statement (regardless of punishment).

This court has held that a "conviction," as that term is used in this statute, is "a judgment of conviction based on a sentence." *Langley v. United States,* 515 A.2d 729, 733 (D.C.1986) (citing *Godfrey v. United States,* 454 A.2d 293, 305 (D.C.1982), and *United States v. Lee,* 166 U.S.App. D.C. 67, 72, 509 F.2d 400, 405 (1974), *cert. denied,* 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975)) (other citations omitted). The question before us here is whether a summary court-martial conviction may be considered a "conviction" under D.C.Code § 14–305.

Shortly before trial in this case, in response to a discovery request, the prosecutor informed defense counsel that in 1988, while stationed in Italy, Corporal Velilla had been convicted of five offenses in a summary court-martial: (1) driving without an Italian endorsement or translation on his driver's license, in violation of Article 92 of the UCMJ, 10 U.S.C. § 892; (2) destruction of property, in violation of Article 92; (3) assault, in violation of Article 128, 10 U.S.C. § 928; (4) threatening to kill a fellow Marine, in violation of Article 134, 10 U.S.C. § 934;

---

**11.** There is no real dispute that the stolen items had at least some value greater than zero. This is sufficient to sustain a second-degree theft conviction. *See Jeffcoat v. United States,* 551 A.2d 1301, 1303 (D.C.1988) (citing cases).

and (5) disorderly conduct, in violation of Article 134. For these offenses Velilla had been sentenced to confinement at hard labor for twenty days, forfeiture of his pay for one month, and reduction in rank to Private, E–1. Asserting that Velilla's conviction on these charges in a summary court-martial proceeding constituted a "conviction" under D.C.Code § 14–305, defense counsel sought to impeach Velilla's credibility at trial.

The trial court rejected counsel's request that the summary court-martial conviction be admitted under section 14–305. In so ruling, the court noted the differences between summary court-martial proceedings and civilian trials. In a summary court-martial, the court said, the presiding officer "is not only the prosecutor but the finder of fact, the sentencer, and the defense attorney," and as a result the defendant does not receive the protections characteristic of more formal and adversarial criminal proceedings. Citing the Supreme Court's decision in *Middendorf v. Henry, supra*, the court ruled that Velilla's summary court-martial conviction could not be used to impeach his credibility.

Appellant now argues that because at least part of the conduct which led to the court-martial proceedings involved dishonesty, the trial court erred in not allowing Corporal Velilla to be impeached with his summary court-martial conviction. *See Ross v. United States*, 520 A.2d 1064, 1065 (D.C.1987) (destruction of property involves dishonesty, and conviction of that offense may be used for impeachment). The government, citing *Middendorf v. Henry*, argues that because summary courts-martial are not criminal proceedings, their adjudications should not be considered "convictions" for the purpose of section 14–305.

This is the first case to come before this court on the issue of whether a summary court-martial conviction is admissible to impeach a witness under D.C.Code § 14–305. While *Middendorf* is very helpful, it is not dispositive of the issue. In *Middendorf* the Supreme Court considered whether a class of Marines had been denied their Sixth Amendment rights when they were convicted in trials by summary court-martial without

being given access to counsel. In ruling that their Sixth Amendment rights had not been violated, the Court held that "the summary court-martial provided for in these cases was not a 'criminal prosecution' within the meaning of [the Sixth] Amendment." *Middendorf v. Henry, supra*, 425 U.S. at 34, 96 S.Ct. at 1287. Nevertheless, a summary court-martial proceeding appears to be a criminal prosecution that produces "a judgment of conviction based on a sentence." *Langley v. United States, supra*, 515 A.2d at 733. The *Middendorf* Court's disposition of the Sixth Amendment issue does not really decide whether a summary court-martial that is "non-criminal" in a Sixth Amendment sense can nonetheless produce a "conviction" that may be used to discredit a witness in a later judicial proceeding in the District of Columbia courts.

We have found only one civilian court decision that has squarely addressed this issue. In *Braswell v. State*, 306 So.2d 609, 613 (Fla.App.1975), *cert. denied*, 328 So.2d 845 (Fla.1976), decided before *Middendorf*, a Florida appellate court prohibited the use of a summary court-martial conviction for impeachment purposes. The court reasoned that a "conviction by a military summary court martial is not a 'conviction' within the meaning of F.S. 90.08," a statute (equivalent to ours) allowing evidence of prior convictions to be used to impeach witnesses. In so ruling, the court observed that "[t]he presumption of innocence which is the [cornerstone] of American criminal jurisprudence receive[s] little if any recognition" in a summary court-martial. *Id.* at 612. The court also took judicial notice of the particularly "summary" character of summary courts-martial in the late 1940's,[12] when "officers selected to conduct [them] seldom had any legal experience or training and little or no guide for conducting the proceeding." *Id.*

Although there are almost no pertinent state court decisions, and apparently no federal court decisions either, the military courts have engaged in an extended debate over the use of summary court-martial convictions. Accordingly, we look to those

---

**12.** The court-martial at issue in *Braswell* took place in 1948.

courts for guidance, keeping in mind that rules of law appropriate for the military may not always be applicable in civilian courts. In particular, we note that a civilian defendant is afforded considerably more due process protection than his or her counterpart in the armed forces. *Middendorf, supra,* 425 U.S. at 38, 96 S.Ct. at 1289; *see Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955). Thus any due process reservations that the military courts may have about the use of summary court-martial convictions are likely to be magnified in a civilian context.

Shortly after the Supreme Court's *Middendorf* decision, the United States Court of Military Appeals decided the case of *United States v. Booker,* 5 M.J. 238 (C.M.A.1977), *vacated in part on other grounds,* 5 M.J. 246 (1978). In *Booker* the court acknowledged potential due process violations arising from the use of uncounseled summary court-martial convictions for impeachment in subsequent court-martial proceedings. The court held that a summary court-martial conviction may not be used for impeachment in a later proceeding unless the defendant had a chance to consult an independent attorney before electing a summary court-martial. Relying primarily on *Middendorf,* the court ruled that "evidence of the imposition of discipline at [a summary court-martial] hearing does not constitute evidence of a conviction for the purposes of impeachment." *Id.* at 244 n. 23. Though *Middendorf* had already held that counsel was not required for a summary court-martial, *Booker* established the principle that subsequent use of a summary court-martial conviction for impeachment depended on whether the defendant had access to counsel before any waiver of full adversarial proceedings. Moreover, *Booker* stated that such a waiver must be in writing and must be voluntary, knowing, and intelligent. *Id.* at 243 n. 20.

*Booker* has received close scrutiny from the military courts. *See United States v.*

*Kelly,* 41 M.J. 833 (N.M.Ct.Crim.App.1995) (restricting *Booker* by permitting use of uncounseled summary court-martial convictions to enhance sentence in subsequent proceeding), *review granted,* 43 M.J. 172 (C.M.A. 1995); *United States v. Jones,* 7 M.J. 806, 812 (N.C.M.R.1979) (criticizing *Booker* and other cases as attempts "to judicially legislate away the true status and nature of the summary court-martial as defined by Congress in the [UCMJ] and confirmed by the Supreme Court in *Middendorf v. Henry* "); *United States v. Mathews,* 6 M.J. 357, 359 (C.M.A.1979) (reading *Booker* broadly as allowing military judge to question defendant, after guilty plea, about prior uncounseled Article 15 proceeding).[13] But the underlying premise of *Booker,* namely, the due process deficiency inherent in the subsequent use of uncounseled summary court-martial convictions, has not been seriously challenged. Particularly useful here is the decision of the Court of Military Appeals in *United States v. Mack,* 9 M.J. 300 (C.M.A.1980), which questioned whether a waiver of full adversarial proceedings could ever, in a military environment, be knowing and intelligent as required by *Booker:*

> In the military context, a refusal of . . . summary court-martial and an ensuing referral of charges to a general or special court-martial may increase dramatically the maximum punishment to which the accused is subject. Under these circumstances the acceptance of . . . trial by summary court-martial cannot be equated with a knowing and intelligent waiver of counsel by the accused.

*Id.* at 314. After noting that the Supreme Court in *Middendorf* had "considered a trial by summary court-martial as something other than a 'criminal prosecution,'" the *Mack* court went on to criticize the reliability of convictions obtained in a summary proceeding for future impeachment purposes:

> When [an] opinion of guilt was formed in a proceeding so informal that it does not

**13.** In *United States v. Sauer,* 11 M.J. 872, 874 (N.M.C.M.R.1981), the Navy–Marine Corps Court of Military Review held that *Mathews* had "in effect" been overruled by the intervening Supreme Court decision in *Estelle v. Smith,* 451

U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). *See also United States v. Kelly, supra,* 41 M.J. at 839 (stating that part of *Mathews* was "discarded" in *Sauer* ).

constitute a "criminal prosecution" for purposes of the Sixth Amendment, its receipt in evidence to ... impeach a witness' credibility seems questionable on due process grounds.

*Id.* at 315. About a year later, the court reiterated its dour view of the reliability of summary court-martial convictions. After quoting at length from *Booker* and *Mack,* the court categorically said, "Clearly, then, our precedents prohibit[ ] the use of summary court-martial convictions to impeach an accused." *United States v. Cofield,* 11 M.J. 422, 432 (C.M.A.1981).[14]

 Appellant argues nevertheless that because Mil. R. Evid. 609(a)(2) permits the use of prior convictions for impeachment "without regard to whether the case was tried by general, special, or summary court-martial," this court should permit the use of summary court-martial convictions for impeachment in the District of Columbia. Leaving aside the due process dichotomy between civilian and military law,[15] we find a significant difference between the military courts' administration of the Military Rules of Evidence and the District of Columbia courts' application of D.C.Code § 14–305. Under the Military Rules, evidence of a prior conviction is admissible only if "the military judge determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Mil. R. Evid. 609(a)(1). By contrast, the law in the District of Columbia gives no such discretion to the trial judge; evidence of prior convictions "shall be admitted if offered." D.C.Code § 14–305(b)(1). A trial court has no discretion whatever to exclude such evidence, even though in a particular case its prejudicial impact may outweigh its probative value. *Langley v. United States, supra,* 515 A.2d at 735; *see Dorman v. United States,* 491 A.2d 455, 458 (D.C.1984) (en banc); *Hill v. United States,* 434 A.2d 422, 428–429 (D.C.1981),

*cert. denied,* 454 U.S. 1151, 102 S.Ct. 1020, 71 L.Ed.2d 307 (1982).

 We hold, therefore, that because a "conviction" stemming from a summary court-martial proceeding lacks the trustworthiness of a conviction resulting from more formal and adversarial criminal proceedings, it cannot be used for impeachment purposes under D.C.Code § 14–305.

## IV

The conviction of unlawful entry is affirmed. The conviction of first-degree theft is reversed, and this case is remanded with directions to enter a judgment of conviction of second-degree theft.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

---

14. *Cofield* was overruled in part on other grounds in *United States v. Sutton,* 31 M.J. 11, 17–18 (C.M.A.1990) (citing *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984)). *See United States v. Rusinskas,* 35 M.J. 808, 809 (N.M.C.M.R.1992) (discussing *Luce* and *Sutton*). The proposition for which we have cited *Cofield* here, however, was not overruled.

15. *See United States v. Kelly, supra,* 41 M.J. at 843–844 (describing "military due process" as "a pattern of rights granted by Congress" to members of the armed services, and requiring an act of Congress before any such due process right may be recognized by a military court).