**Andre CHAPPELLE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 98–CF–151.**

District of Columbia Court of Appeals.

Submitted June 24, 1999.

Decided Aug. 5, 1999.

Sara E. Kopecki, Washington, DC, appointed by the court, was on the brief for appellant.

Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., Gary M. Wheeler and Heather R. Epstein, Assistant United States Attorneys, were on the brief for appellee.

Before STEADMAN and REID, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge.

Appellant, Andre Chappelle, was convicted of first degree burglary, D.C.Code § 22–1801(a) (1995 Repl.), and first degree theft, D.C.Code § 22–3812(a) (1995 Repl.). Chappelle appeals, contending: (1) the trial court erred in admitting evidence that a police officer knew where he "hangs out"; (2) the government's rebuttal argument was improper and prejudicial; and (3) the evidence was insufficient to support a conviction of first degree theft. We agree that the evidence does not support first degree theft, and reverse that conviction. We affirm the conviction of first degree burglary, and direct entry of a conviction for second degree theft.

## I.

On August 3, 1997, sometime after 3:00 a.m., James Gant was sitting on his front porch when he saw two men walk past his house on Pleasant Street. One man wore dark pants and a striped shirt. The other, a taller man, wore dark pants and a light colored t-shirt.

After briefly losing sight of the two men, Gant saw them cross the street. Gant saw the two men walk into the front yard of a house that belonged to his neighbor, John Gray. The two men walked over to a window, and began to pry it open. Once the window was open, the man in the striped shirt put his head and shoulders through the window, into the house. The man then came back out of the window, and the two men walked away from the house. About two to four minutes later, the men returned. The taller man had changed his shirt to one of a darker color. Both men now wore black stocking caps. Gant observed the man in the striped shirt go through the window again, up to his waist. At this point, Gant called the police.

Officer Andre Kimvilakani was informed of a possible burglary in progress, and responded. When Kimvilakani arrived at Gray's house, he observed a milk crate under the window. When other officers arrived, Kimvilakani knocked on the door. Gray came to the door and let the police search his home. After completing the search, Kimvilakani asked Gray if anything was missing. Gray immediately noticed that a telephone was missing from his desk in front of the open window. Gray had purchased the telephone from Bell Atlantic two to three weeks prior to the burglary. The telephone had "six different operations on it," including caller identification and an answering machine. The base price of the telephone was $249. Gray, however, also paid $7.50 for shipping and handling, and $54.58 for a warranty contract.

Gray told Kimvilakani that Chappelle had been in his house that day. Gray had told Chappelle that he was looking for a refrigerator. Chappelle told Gray that he could get one for $50. Chappelle left and came back later to Gray's house with another individual and a large refrigerator. Later, Chappelle returned again, asking Gray if he wanted to buy a television for $20. Sometime between midnight and 1:00 a.m., Chappelle and this second individual returned with the television and left.

After hearing that Chappelle had been in the house earlier, Kimvilakani asked the other officers to locate him. Kimvilakani searched the neighborhood, and found Chappelle. He testified that he was able to find Chappelle because, "I know where he hangs out." When Kimvilakani found Chappelle, he was wearing a white shirt with blue and red pinstripes, and black pants. Chappelle was not in possession of the telephone, which was never recovered.

Kimvilakani took Chappelle back to Pleasant Street for a possible identification. Chappelle stood across the street, while Gant looked at him from his porch. Kimvilakani testified, "As soon as he saw Mr. Chappelle he said that is one of them. That is the short one."

Defense counsel challenged Kimvilakani's testimony in closing argument:

Do you think Officer Kimvilakani had an agenda in this trial? Do you think he had an agenda on August 3rd? For example, what about some of his gratuitous comments? He knows where Mr. Chappelle hangs out. He doesn't know where Mr. Chappelle lives. He doesn't know where he works. He doesn't know who his friends are. He knows where he hangs out.

The government responded to this argument in its rebuttal:

You determine from Officer Kimvilakani whether or not he has an agenda. Don't let the defense put that in your mind. You determine whether or not he has an axe to grind. He told you that he knew where the defendant hangs out and he went to that place. Where was that place? A block away from Mr. Gray's home. That's where they found Mr. Chappelle.

So was he accurate when he said he knew where he hangs out? On cross-examination, did defense counsel ask Officer Kimvilakani if he knew where he lived, where he worked, who his friends were? They had an opportunity to ask all that. They didn't.

After defense counsel's objection was overruled, the government continued:

They didn't ask those questions. The questions he was asked, he answered. He knew where he hung out, a block away. That is where he found him. He was accurate. That's pretty good investigation, wouldn't you say? But that is your determination.

## II.

■ Chappelle contends that the trial court erred in admitting the testimony of Kimvilakani that he knew where Chappelle "hangs out." Chappelle argues that this testimony was unfairly prejudicial because

it amounts to evidence of other bad acts. *See Johnson v. United States,* 683 A.2d 1087, 1090 (D.C.1996) (en banc); *Drew v. United States,* 118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964).

We have held that evidence of prior contacts with the police does not necessarily translate into evidence of actual arrests. *See Butler v. United States,* 688 A.2d 381, 389 (D.C.1996). Chappelle's argument here, therefore, is unavailing.

■ Chappelle next contends that the trial court erroneously permitted the government to argue in its rebuttal that defense counsel failed to cross-examine Kimvilakani concerning how he knew where Chappelle "hangs out." The record indicates that in closing argument, defense counsel suggested that Kimvilakani had an agenda because he knew where Chappelle "hangs out," and not where he lives or works. In rebuttal, the government responded that defense counsel had an opportunity on cross-examination to ask Kimvilakani if he knew where Chappelle lives or works, but did not.

■ In rebuttal argument, the government may respond to challenges to witness credibility made in the closing argument of the defense. *See Coleman v. United States,* 515 A.2d 439, 450–51 (D.C. 1986); *Medina v. United States,* 315 A.2d 169, 170 (D.C.1974). The government may "argue the strength of its case and contrast it with the weakness of [the] defense." *Harris v. United States,* 602 A.2d 154, 165 (D.C.1992). Here, the government responded to a direct challenge to the motivation and credibility of a witness. Accordingly, the government's rebuttal argument was proper.

### III.

■ Finally, Chappelle contends that the evidence was insufficient to support a conviction of first degree theft. Specifically, Chappelle argues that the government failed to present sufficient evidence concerning the value of the property taken.

A person can be convicted of first degree theft, a felony, when the value of the property obtained is $250 or more. D.C.Code § 22–3812(a). If the value is below $250, a person can only be convicted of second degree theft, a misdemeanor. D.C.Code § 22–3812(b).[1]

■ It is well established that the government must prove the fair market value of the property stolen. *Eldridge v. United States,* 492 A.2d 879, 882 (D.C. 1985). "[N]o one method [of proving value] is preferred over others." *Zellers v. United States,* 682 A.2d 1118, 1120 (D.C. 1996). "The market value of a chattel ... may be established by the testimony of its non-expert owner." *Saunders v. United States,* 317 A.2d 867, 868 (D.C.1974) (citation omitted). When the owner testifies as to the purchase price, factors to be considered are whether the purchase was very recent, whether the chattel was in mint condition, and whether the chattel was subject to prompt depreciation or obsolescence. *See Zellers, supra,* 682 A.2d at 1120. "[W]e have been very strict in requiring affirmative proof of value, especially when the value alleged is close to the line dividing one offense from another." *Id.* at 1121 (citing *Williams v. United States,* 376 A.2d 442, 444 (D.C.1977)).

In this instance, the base price of the telephone itself is $249. This amount is just below the dividing line between the first degree and second degree theft charges. We must determine, then, whether the price of shipping and handling, and the warranty contract can, be included in determining the value of the chattel.

To address this question, we turn to the words of the statute. In order for the conduct to be theft of the first degree, "the value of the *property* obtained" must be $250 or more. D.C.Code § 22–3812(a)

---

1. The maximum incarceration for first degree theft is ten years in prison, that for second degree theft is 180 days. D.C.Code § 22–3812.

(emphasis added). While a person can be convicted for the theft of services, that person must obtain the services without payment, knowing or having reason to know that the services were only available for compensation. D.C.Code § 22–3811(c) (1995 Repl.).

The record before us does not indicate with specificity the nature of the seller's agreement represented by the $54.58 charge. The only item introduced by the government into evidence was the sales invoice. Testimony referred to the agreement in such various terms as a "guarantee," a "warranty," and a "service contract." But in any event, the obligations encompassed in the agreement were not exclusive to the stolen telephone and thus arguably an integral part of its "value." Rather, the owner acknowledged in cross-examination that the "contract carried over to the next phone" that he bought. Therefore the cost of these transferable ancillary services cannot be considered in determining the value of the property taken.[2] Accordingly, since the base price of the telephone was below $250, the conviction of first degree theft must be reversed. Because the evidence presented supports a conviction of second degree theft, *see* D.C.Code § 22–3812(b) (1995 Repl.), we reverse the conviction and remand for entry of judgment of conviction for second degree theft. *See Malloy v. United States*, 483 A.2d 678, 681 (D.C.1984).

Accordingly, the conviction of first degree theft is hereby reversed, and the case remanded for an entry of judgment of conviction for second degree theft and for resentencing.

The conviction of first degree burglary is hereby affirmed.

*So ordered.*

---

2. The government makes no argument in its brief for the inclusion of the shipping and handling charge in the definition of "value." In any event, this charge was incurred by the owner because he had the telephone delivered to his home by mail. No evidence was presented that the telephone was otherwise unavailable.