**UNITED STATES, Appellee,**

v.

**Kelsey A. MILLER, Private, U.S. Marine Corps, Appellant.**

No. 96–0805.
Crim.App. No. 91–0783.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 7, 1997.

Decided March 17, 1998.

For Appellant: *William J. Holmes* (argued); *Lieutenant C.J. McEntee*, JAGC, USN (on brief); *Lieutenant John Holden*, JAGC, USNR.

For Appellee: *Lieutenant Randy S. Kravis*, JAGC, USNR (argued); *Colonel Charles Wm. Dorman*, USMC (on brief); *Commander David H. Myers*, JAGC, USN.

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officers convicted appellant, contrary to his pleas, of conspiracy, robbery, and assault with intent to commit robbery, in violation of Articles 81, 120, and 134, Uniform Code of Military Justice, 10 USC §§ 881, 920, and 934, respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 10 years, total forfeitures, and a fine. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

Our Court granted review of the following issues:

I.

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY ADMITTING ADMISSIONS MADE BY APPELLANT DURING A CUSTODIAL INTERROGATION BY A MILITARY POLICEMAN IN THE EXECUTION OF HIS LAW ENFORCEMENT DUTIES WHERE APPELLANT WAS NEVER ADVISED OF HIS ARTICLE 31 OR FIFTH AMENDMENT RIGHTS.

II

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL CONSTITUTIONAL ERROR BY REFUSING TO ALLOW APPELLANT TO IMPEACH THE SOLE PROSECUTION WITNESS WITH A CONVICTION AND OTHER ACTS OF DISHONESTY WHICH ARE PERMITTED UNDER THE RULES OF EVIDENCE AND REQUIRED BY THE SIXTH AMENDMENT.

III

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY REFUSING TO APPLY THE CORRECT LEGAL STANDARD AND PREVENTED APPELLANT FROM TESTIFYING ON HIS OWN BEHALF.

## IV

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY PERMITTING NIS AGENT BILLER TO BE DESIGNATED AS A GOVERNMENT REPRESENTATIVE AND TO LISTEN TO ALL OF THE TESTIMONY AND CROSS–EXAMINATION BEFORE TESTIFYING AND INTERPRETING AND GIVING HIS IMPRESSIONS OF THAT EVIDENCE.

For the reasons set out below, we affirm the decision of the Court of Criminal Appeals.

### Factual Background

At about 1:30 a.m. on the morning of January 12, 1990, two Marines were attacked and robbed outside a barracks at Camp Geiger, near Camp Lejeune, North Carolina. The attackers were identified as five black males. Lance Corporal (LCpl) Copeland was standing in the rear doorway of the barracks and saw the attack. He testified that he saw five individuals crouched down near a roadway and watched as they ran toward the rear of building 544, a unit barracks. LCpl Copeland walked to the rear door of building 544 and saw two individuals beating one of the victims. LCpl Copeland notified the duty noncommissioned officer (NCO) that "something" was happening and then picked up a metal rod and began running toward the assailants. As two of the assailants jumped up and ran past Copeland at a distance of 6–7 feet, he recognized them. At trial he identified appellant as one of the assailants.

Initially, LCpl Copeland was a reluctant witness. At trial he admitted that, on the night of the incident, he accompanied the two victims to the naval hospital and was interviewed by the military police, but that he intentionally gave them the impression that he did not know the identity of the assailants. He explained that he "didn't really want to get involved with what was going on."

On cross-examination, Copeland testified that he was in the same company as appellant and the four other assailants. He admitted that, in his first two sworn statements to

the investigators, he did not identify appellant by name. He also admitted that, after he returned to the barracks, he learned that appellant and Private First Class (PFC) Smith had been apprehended, but when Special Agent (SA) Biller asked him if appellant and PFC Smith were the two assailants, he told Biller that they were not. On January 17, 1990, 5 days after the incident, Copeland finally told SA Biller that appellant and PFC Smith were the assailants.

LCpl Copeland also admitted at trial that he told SA Biller under oath and testified at the Article 32[1] investigation that he did not know PFC Smith by name, but that those statements were false. Copeland eventually admitted knowing Smith by name after he was extensively cross-examined at the Article 32 hearing.

Finally, LCpl Copeland admitted that, at the hospital, one of the victims, LCpl Bender, asked him if he knew who the assailants were. Copeland testified that he told Bender that he knew who they were, but he did not tell Bender their names because Bender "just said he wanted to go around and beat somebody up," and appellant "just didn't want to tell him at that time."

Neither of the two victims were able to identify their assailants. One told the Naval Investigative Service (NIS) agents that his assailants were black. Although he was unsure, he thought his assailants were wearing "cammies," the Marine Corps camouflage utility uniform. The other victim knew only that his assailants were black, but he did not know what they were wearing. The company duty NCO reported to the military police that the assailants were wearing civilian clothes.

Appellant presented an alibi defense. He asserted that he spent the evening with four friends at an off-base club called Rich's. When the club was closed early by the fire marshall because it was overcrowded, he and his friends went to the Scotchman, a combination gas station and convenience store, where they purchased $2.00 worth of gasoline, and then to a Burger King fast-food restaurant. Then they went to Beacham's

---

1. *Uniform Code of Military Justice,* 10 USC § 832.

Apartments, an off-base apartment complex where appellant left his car, and they took a taxi onto Camp Geiger, arriving at about 3:00 a.m. on the morning of January 12, 1990.

In support of his alibi, appellant presented the testimony of several witnesses who saw him at Rich's club. LCpl Fowler testified that he was with appellant the entire evening and that he and appellant were not involved in the robbery. LCpl Phillips testified that he saw appellant at Rich's club between 11:30 p.m. and midnight but could not say when appellant left the club. LCpl Taylor's stipulated testimony was that he saw appellant at Rich's club at about 1:00 a.m. and later at the Burger King. LCpl Rembert's stipulated testimony was that he saw appellant at Rich's club on the night of January 11, but that he could not recall when he saw him.

In support of his claim that he went from Rich's club to the Scotchman convenience store, appellant presented the testimony of Ms. Brooks, a young woman who saw LCpl Fowler at Rich's and saw appellant at the Scotchman after Rich's closed. Another young woman, Ms. Hightower, testified that she saw PFC Bell, one of appellant's companions, at the Scotchman. A Scotchman employee, Mr. Pearson, testified that a group of black males came into the store and purchased $2.06 worth of gasoline. He was unable to identify appellant as one of the males he saw. Appellant presented a store receipt showing two purchases of $2.06 worth of gasoline purchased at 1:49 a.m. and 1:56 a.m. The gasoline was sold at a discount, so that a $2.06 purchase would actually cost $2.00.

To support his claim that he and his companions went from the Scotchman to a Burger King restaurant, appellant presented a receipt showing a purchase of food at 2:21 a.m., the testimony of Cpl Hampton, and the stipulated testimony of LCpl Taylor.

To rebut appellant's alibi, the prosecution presented a sign-in log from Rich's, on which appellant's and LCpl Fowler's names do not appear. In response, the defense presented several witnesses who testified that the sign-in policy was not always enforced.

The prosecution also presented the testimony of Mr. Tim Newton, a taxi driver re-cently released from active duty as a Marine. Mr. Newton testified that he picked up five Marines from the barracks of the 3d Battalion, 6th Marines, at Camp Geiger, between 8:00 p.m. and 10:00 p.m. on January 11, 1990. He took them to Beacham's Apartments outside Camp Geiger. He heard one of them say, "Take my car, I'm going to Rich's lounge." He saw the same Marines again between 3:00 a.m. and 4:00 a.m. on January 12 at an off-base cab stand. One Marine asked him to follow them to Beacham's Apartments "so they could put his car back." Mr. Newton took the Marines from Beacham's Apartments onto Camp Geiger. At the gate, he had his passengers execute a "night log," which he gave to the military police (MP) at the gate. The log lists the passengers as appellant, LCpl Fowler, PFC Bell, PFC Ratliff, and Private Smith. Mr. Newton testified that, as he drove into the quadrangle near barracks 544, he heard one of the Marines say, "Hey guys, we can't jump Tim because he's bigger than us—he's bigger than all of us and besides that, he's black, but if he wasn't, we'd still jet on his ass."

## ISSUE I: APPELLANT'S ADMISSIONS

Sergeant (Sgt) Davis, an MP from Marine Corps Air Station, New River, responded to a request from Camp Lejeune for assistance in investigating the robbery. Sgt Davis had received only a general description of the suspected robbers. They were described as five black males, medium build, wearing civilian clothing, and having haircuts "that a Marine would wear, similar to like a high and tight type haircut, neatly groomed."

At about 3:00 a.m. Sgt Davis observed appellant and four other black males exiting a taxi near barracks 544. As he drove his vehicle close to the five men, someone said, "Here come the MP's, let's go," and two men ran into the barracks. Sgt Davis stopped the remaining three, identified them from their military identification cards, and told one of them to bring the other two men out of the barracks. After the three men came out of the barracks, Sgt Davis asked them where they had been, and they told him that they had been to a club. The men were neatly

dressed in civilian clothing. One man's shoes were muddy. Sgt Davis could smell alcohol on some of them. Initially they were nervous, but they calmed down and were cooperative.

As Sgt Davis was talking to the five men, the Officer of the Day (OD) approached. Sgt Davis asked the OD if he knew the five men, and he said he did. Sgt Davis told the OD, "[I]f we need to talk to them later on, then we'll get up with them, or we'll have you, you know, get them back out here." The five men then began walking toward the barracks.

At about 3:10 a.m., LCpl Sepulvado arrived on the scene. LCpl Sepulvado was an MP from Camp Lejeune. He had responded to the original robbery report and was patrolling the Camp Geiger area. As the five men were walking away, LCpl Sepulvado told Sgt Davis that he needed "to talk to them." They were brought back, and LCpl Sepulvado filled out "stat sheets" on each man. The "stat sheets" contained identifying information and answers to "routine questions of where you've been, what are you doing, where were you in the last few minutes." He asked for identification cards, but none of the five men produced them. At trial LCpl Sepulvado did not explain the lack of identification, except to comment that "normally Marines don't carry ID cards out in town in civilian clothes." He obtained the identifying data from the five men in response to questions, and in the process he incorrectly listed appellant's military grade as lance corporal instead of private.

LCpl Sepulvado listed appellant and his four companions in the "victim/suspect" line of the "stat sheet". He wrote the following in the "details" section of appellant's "stat sheet": "Beacham Apt's is were [sic] subject state a taxi picke [sic] him up." LCpl Sepulvado made no entry on the "incident" line of the "stat sheet" because, in his view, "no one as far as I knew was charged with anything."

LCpl Sepulvado's testimony was offered by the prosecution to rebut appellant's alibi defense by suggesting that appellant was evasive when questioned about his whereabouts.

Trial counsel asked LCpl Sepulvado what appellant said in response to questions about his whereabouts and activities. Over defense objection, LCpl Sepulvado testified that he asked appellant where he had come from in the taxi, and appellant responded, "Beacham's Apartments." When asked where the apartment was, appellant said he did not know. When asked what he was doing at the apartment, appellant said, "[T]hat's where the taxi picked him up." Upon further questioning, appellant said he did not know anyone at the apartment, was not attending a party there or staying there, but "that's just where the taxi picked him up at." Asked where he had been before going to Beacham's Apartments, appellant simply said that he was "out in town." LCpl Sepulvado asked what clubs or restaurants he visited, and appellant "simply stated just out in town" but did not name any specific places.

Defense counsel initially objected to LCpl Sepulvado's testimony on the grounds that it had not been disclosed to the defense and it was not preceded by Article 31(b)[2] warnings. Because of the non-disclosure, the military judge would not permit the testimony during the prosecution's case-in-chief, but he permitted LCpl Sepulvado's testimony in rebuttal. When LCpl Sepulvado was tendered as a rebuttal witness, defense counsel appears to have withdrawn his Article 31(b) objection, telling the military judge, "Sir, after reviewing the law, I will not object to admission of the statements for those purposes." After then briefly arguing that the initial investigatory stop by Sgt Davis was followed by a second interview by LCpl Sepulvado where "they didn't have a choice in that matter ... it wasn't up to them whether or not they could leave," defense counsel did not renew his objection.

■ Appellant now contends that LCpl Sepulvado should have given Article 31(b) warnings because he was a suspect and in custody when LCpl Sepulvado questioned him. The Government argues that appellant waived the Article 31(b) issue by failing to object. The Government further argues that

2. UCMJ, 10 USC § 831(b).

Article 31(b) warnings were not required because appellant was not a suspect and was not in custody.

This may well be an appropriate case for waiver, based on defense counsel's apparent acquiescence, "after reviewing the law," in the military judge's determination that Article 31(b) warnings were not required; but we do not resolve this issue on the basis of waiver. *See* Mil.R.Evid. 103(a)(1), Manual for Courts–Martial, United States (1995 ed.). We hold that, even if the issue was not waived, the military judge did not err in admitting the evidence.

We first hold that the Fifth Amendment was not implicated, because this was not a custodial interrogation. In *United States v. Schake,* 30 MJ 314, 318 (1990), we adopted the Supreme Court's definition of custodial interrogation as a situation where a suspect "reasonably believed that his 'freedom of action [was] curtailed to a "degree associated with formal arrest." ' " *See Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984), quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). In *United States v. Fagan,* 28 MJ 64, 69 (1989), this Court also recognized that military persons enjoy considerably less freedom of movement than civilians. Thus, we hold that the brief detention of appellant by Sgt Davis and LCpl Sepulvado for the purpose of ascertaining his identity and briefly questioning him about his whereabouts falls short of a deprivation of freedom "associated with formal arrest" or a custodial interrogation.

■ We turn next to appellant's claim that he was a "suspect" within the meaning of Article 31 and should have been advised of his rights. We hold that appellant was not a suspect.

■ Whether a person is a suspect is a question of law that we review *de novo. United States v. Davis,* 36 MJ 337, 340 (CMA 1993), *aff'd,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The Court of Criminal Appeals concluded that the information available to LCpl Sepulvado would not even justify a *Terry* stop. *See* Mil.R.Evid. 314(f)(1);

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We agree.

Based on the evidence available to LCpl Sepulvado, we hold that the investigation had not sufficiently narrowed to make appellant a suspect. *See Davis,* 36 MJ at 341. LCpl Sepulvado knew only that the alleged assailants were black males in civilian clothing who, based on their short haircuts, probably were Marines. LCpl Sepulvado's questioning of appellant and his four companions did not amount to a *Terry* stop. It was no more than an attempt to find witnesses to the crime and a preliminary effort to screen out those who could not have been involved. Indeed, appellant's claim of alibi and neat civilian clothing tended to exclude him as a potential suspect.

LCpl Sepulvado did not regard appellant as a suspect and did not think that his contact with appellant warranted an entry in the incident block of the "stat sheet." Because the investigation was still in the beginning stages of preliminary screening of potential witnesses and suspects, we agree with the court below that the information available to LCpl Sepulvado falls short of the reasonable suspicion required for a *Terry* stop, and that no *Terry* stop occurred. Accordingly, we hold that appellant was not a suspect within the meaning of Article 31.

### ISSUE II: IMPEACHMENT OF PROSECUTION WITNESS

■ LCpl Copeland was the only government witness to identify appellant as an assailant. The military judge granted a government motion *in limine* to prevent defense counsel from asking LCpl Copeland about his adjudication as a juvenile offender. Defense counsel offered no documentary evidence of the juvenile adjudication but merely referred to LCpl Copeland's testimony at the Article 32 investigation "that he and a friend of his or his friend stole some jewelry from an individual, and he had hidden it and the police found out about it." Copeland's testimony at the Article 32 was as follows:

Me and a friend had went out, sir, and my friend grabbed a chain off another guy.

He gave me the chain and I went home. He got caught and the police came and picked me up, sir.

LCpl Copeland testified at the Article 32 that he was "given youthful offender status ... and put on probation." He was 15 or 16 years old at the time. LCpl Copeland was 20 years old when he testified at the Article 32.

Appellant contends that the military judge violated his right of confrontation under the Sixth Amendment by depriving him of the opportunity to impeach LCpl Copeland with the juvenile adjudication. The Government contends that the military judge did not abuse his discretion.

If LCpl Copeland had been convicted of larceny as an adult, his conviction may well have been admissible to attack his credibility under Mil.R.Evid. 609(a). However, Mil. R.Evid. 609(d) provides that "[e]vidence of juvenile adjudications is generally not admissible under this rule." The rule gives the military judge discretion to admit evidence of a juvenile adjudication if two conditions are met: (1) "if conviction of the offense would be admissible to attack the credibility of an adult"; and (2) "the military judge is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence." *Cf. United States v. Hughes,* 26 MJ 119 (CMA 1988) (juvenile adjudication not a "conviction" under RCM 1001(b)(3)(A), Manual, *supra* ).

In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court held that a defendant's Sixth Amendment right of confrontation was violated when he was precluded from cross-examining a key witness against him. In *Davis* the defendant did not offer the juvenile adjudication to impeach the witness' general character for truthfulness but, rather, to show that the witness was biased. The defense theory was that the witness, who was still on probation, made a hasty identification of the defendant, under pressure from the police, because he was afraid of having his probation revoked.

The Supreme Court distinguished between evidence of a crime as "a general attack on the credibility of the witness," and a "more particular attack" by cross-examining the witness about "possible biases, prejudices, or ulterior motives". *Id.* at 316, 94 S.Ct. at 1110. The case before us involves the former; *Davis* involved the latter.

Appellant does not argue that LCpl Copeland was biased or prejudiced against him, but only that he was mistaken. Unlike the situation in *Davis,* the defense did not identify any ulterior motive for LCpl Copeland's identification of appellant. *See United States v. Ciro,* 753 F.2d 248, 249 (2d Cir.1985) (distinguishing *Davis* on same basis but taking prosecution to task for injecting unnecessary appellate issue). To the contrary, Copeland was a reluctant witness who delayed identifying appellant because he did not want to get involved.

■ A military judge has broad discretion regarding admissibility of impeachment evidence. *United States v. Sitton,* 39 MJ 307, 310 (CMA 1994). Based on defense counsel's sparse offer of proof, it would appear that Copeland's involvement in the juvenile offense was tangential, happened several years before the court-martial, and furnished only general evidence on his credibility as opposed to specific bias or prejudice. Because of the tangential nature of the evidence, its admission was not "necessary for a fair determination of the issue of guilt or innocence." Mil. R.Evid. 609(d). Accordingly, we hold that the military judge did not abuse his discretion by excluding the evidence of LCpl Copeland's juvenile adjudication.

## ISSUE III: IMPEACHMENT
## OF APPELLANT

■ Before entry of pleas, defense counsel made a motion *in limine* to preclude the prosecution from impeaching appellant with evidence of two juvenile adjudications for battery and a special court-martial conviction for assaulting an NCO. The Government responded that it would not ask appellant about his juvenile adjudications, but that it would cross-examine him about his special court-martial conviction if he testified. The military judge declined to rule on the motion, saying that he was unable to weigh the pro-

bative value and prejudicial impact of the evidence unless appellant testified. He gave defense counsel the option to renew the motion *in limine* "just before the accused testifies."

At the end of the defense case on the merits, defense counsel renewed his motion. The military judge denied the motion and offered to give a limiting instruction if appellant testified and evidence of the special court-martial conviction was elicited. Defense counsel then announced that, "but for this ruling," appellant would have testified, but that he "has decided that he will not testify" in light of the military judge's ruling on the motion.

Appellant now contends that the possible admission of the impeachment evidence precluded appellant from testifying. The Government argues that the military judge did not abuse his discretion by denying the defense motion *in limine*. We hold that the military judge did not abuse his discretion.

The version of Mil.R.Evid. 609 in effect when appellant was tried provided in pertinent part as follows: [3]

(a) *General rule.* For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross-examination but only if the crime (1) was punishable by death, dishonorable discharge, or imprisonment in excess of one year under the law under which the witness was convicted, and the military judge determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused, or (2) involved dishonesty or false statement, regardless of the punishment. In determining whether a crime tried by court-martial was punishable by death, dishonorable discharge, or imprisonment in excess of one year, the maximum punishment prescribed by the President under Article 56 at the time of the conviction

applies without regard to whether the case was tried by general, special, or summary court-martial.

Manual for Courts–Martial, United States, 1984 (Change 3 June 1, 1987).

■■■ Even if evidence is relevant, it may be excluded under Mil.R.Evid. 403 "if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." A military judge has "broad discretion" in balancing the probative value against the prejudicial impact of impeachment evidence based on previous convictions. The military judge's ruling will not be disturbed on appeal "absent a clear showing of abuse of discretion." *United States v. Brenizer,* 20 MJ 78, 82 (CMA 1985). The balancing test under Mil. R.Evid. 609 is less stringent than under Mil. R.Evid. 404(b). *See* 4 Weinstein's Federal Evidence, § 609.04[2][a][i] (2d ed.1997), citing *United States v. Valencia,* 61 F.3d 616, 618–19 (8th Cir.1995) (prior conviction admissible under Rule 609 even though excluded under Rule 404(b)).

In *Luce v. United States,* 469 U.S. 38, 43, 105 S.Ct. 460, 464, 83 L.Ed.2d 443 (1984), the Supreme Court held "that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." In *United States v. Cofield,* 11 MJ 422 (1981), this Court had held that an issue of improper impeachment with a prior conviction was preserved for review even though the accused had not testified.

This Court addressed the impact of *Luce* on *Cofield* in *United States v. Sutton,* 31 MJ 11, 18 (1990), and held that "reviewability of *in limine* rulings in courts-martial tried after the date of this opinion will be controlled by *Luce* and future decisions of the Supreme Court." Appellant's case is not affected by *Sutton,* however, because it was tried 5 months before *Sutton.* Thus, we hold that the issue was preserved, even though appellant did not testify.

---

**3.** The December 1, 1990, amendment to Fed. R.Evid. 609 became part of the Military Rules of Evidence by operation of law on May 30, 1991. *See* 111 S.Ct. 39 (1990) (preface) and Mil.R.Evid.

1102. This amendment was not applicable to appellant's trial, which was completed on April 14, 1990.

In *Brenizer*, 20 MJ at 80, this Court listed the following five factors relevant to balancing, recognizing that there may be other pertinent factors in a given case:

(1) The impeachment value of the prior crime.

(2) The point in time of the conviction and the witness' subsequent history.

(3) The similarity between the past crime and the charged crime.

(4) The importance of the [accused's] testimony.

(5) The centrality of the credibility issue.

Applying the *Brenizer* factors to this case, we conclude that the military judge did not abuse his discretion. Appellant's conviction had some impeachment value. Although it was not an offense involving dishonesty, it does reflect lack of respect for the established order and would be relevant in determining whether appellant would "take lightly his obligation to testify truthfully" and place his own interests above the integrity of the judicial system. *See Brenizer*, 20 MJ at 81. This factor appears to slightly favor admissibility. *See* Weinstein, *supra* at § 609.04[2][a][i] and [ii].

The conviction was recent, slightly more than a year before the court-martial. This factor gives more probative value to the evidence and weighs in favor of admissibility. *Id.* at § 609.04[2][a][iii].

The conviction was not so similar to the charged offenses as to suggest propensity to commit robbery. This lack of similarity to the charged offense favors admissibility. *Id.* at § 609.04[2][a][iv].

Appellant's personal testimony would have been helpful to his defense, but it was not the lynchpin of the defense. His alibi had some holes in it, but it was supported by numerous other witnesses and documentary evidence. Appellant's ability to establish his defense without testifying weighs in favor of admissibility. *Id.* at § 609.04[2][a][v], citing *United States v. Causey*, 9 F.3d 1341, 1344 (7th Cir.1993) (defendant did not need to testify to raise defenses).

This case was not a one-on-one swearing contest, but appellant's credibility would have been important if he had testified. LCpl Copeland's eyewitness identification was contradicted only by LCpl Fowler, appellant's alleged co-actor. This factor weighs in favor of admissibility. *Id.* at § 609.04[2][a][vi].

In *Cofield*, we recognized the difficulty of evaluating the impact of the military judge's ruling where an accused does not testify. We observed:

One reason for judicial reluctance to allow review under circumstances like those of the case at bar is the difficulty of determining somewhat in the abstract whether an erroneous ruling has been made. For example, even if we rule that usually a conviction by summary court-martial is inadmissible to impeach an accused after he has testified on direct examination, there may be extraordinary circumstances when such a conviction would be admissible—for example, if an accused uses inadmissibility as a sword, rather than a shield, by testifying on direct examination that he has never been convicted of an offense by any kind of court-martial. Similarly, the difficulty of establishing whether an erroneous ruling prejudiced an accused who has not taken the stand undoubtedly has helped induce some courts to forestall the inquiry as to prejudice by simply refusing to review the ruling of the trial court unless the appellant has testified.

11 MJ at 426–27 (citations omitted).

The military judge expressed the same frustration in this case when he responded to defense counsel's assertion that the probative value of appellant's conviction was substantially outweighed by the potential for prejudice. The military judge stated, "I can't tell that until I hear him testify, counsel." Thus, while we hold that the issue was preserved for review, we are unable to find a clear abuse of discretion without seeing how strong and convincing appellant's testimony would have been if he had testified. *See generally United States v. Mahone*, 537 F.2d 922, 929 (7th Cir.1976) (encourages judges to make explicit finding that probative value outweighs prejudice; encourages defense

counsel to point out specific prejudicial impact).

## ISSUE IV: FAILURE TO SEQUESTER GOVERNMENT WITNESS

 On the fourth day of the court-martial, but before entry of pleas or introduction of evidence on the merits, trial counsel announced that SA Biller, a criminal investigator, would be sitting with trial counsel as a government representative for the remainder of the trial, in accordance with Mil.R.Evid. 615. Defense counsel objected on the ground that SA Biller was a potential government witness. Trial counsel conceded that SA Biller was a possible government witness. SA Biller had already testified in connection with a defense motion to suppress the testimony of LCpl Copeland. The basis for this motion was an assertion that SA Biller had suggested to Copeland that appellant was one of the assailants.

During the trial on the merits, SA Biller was called as a prosecution witness, and the defense renewed its objection. Trial counsel represented that SA Biller would not testify about any matters covered by preceding witnesses. The defense argued that its ability to cross-examine SA Biller had been compromised. The military judge overruled the defense objection.

On direct examination SA Biller described his examination of the crime scene on the morning of January 12; his apprehension of appellant and PFC Smith in the barracks; his seizure of clothing from the living areas of appellant, Smith, and Bell; and his seizure of the Burger King receipt from Bell's area.

Cross-examination of SA Biller focused on the lighting conditions at the crime scene; LCpl Copeland's reluctance to identify the assailants; and contradictory and false information initially provided by Copeland. SA Biller also described appellant's alibi and his interviews with the witnesses who supported the alibi. In this respect, SA Biller's description of appellant's alibi was consistent with the defense case.

On redirect SA Biller identified the sign-in log from Rich's Lounge. On recross, SA Biller described the victims' uncertainty about the identity or description of their assailants.

Notwithstanding its previous objection to SA Biller testifying after having heard the preceding testimony, the defense also called SA Biller as a witness on the merits to establish the time of the offense, the time of appellant's return to the base, LCpl Copeland's lack of complete disclosure about what he had witnessed, and the driving time and distance from Rich's Lounge, the Scotchman, and the Burger King to Camp Geiger. Twice during his testimony, defense counsel asked him to recall and comment on the testimony of witnesses who had preceded him.

Appellant now asserts that the military judge's failure to exclude SA Biller from the courtroom was prejudicial because it compromised the defense theory that SA Biller had unfairly and improperly suggested to LCpl Copeland that appellant was the assailant. Appellant argues that, at a minimum, the military judge should have required that SA Biller testify first. The Government argues that appellant has been unable to point to anything in SA Biller's testimony indicating that it was influenced by his ability to hear the testimony of the witnesses who preceded him.

 Mil.R.Evid. 615 mandates sequestration of witnesses at the request of either side, but "does not authorize exclusion of ... a member of an armed service or an employee of the United States designated as representative of the United States by the trial counsel...." The purpose of the sequestration rule is to prevent witnesses from shaping their testimony to match another's and to discourage fabrication and collusion. *United States v. Croom*, 24 MJ 373, 375 (CMA 1987).

Once trial counsel designated SA Biller as a government representative, the military judge had little discretion to exclude him. *See* Drafters' Analysis of Mil.R.Evid. 615, Manual, *supra* (1995 ed.) at A22–47 (military judge "lacks any discretion" to exclude witnesses covered by Mil.R.Evid. 615(2) and (3) unless constitutional right to fair trial would be violated). Although appellant argues that

the military judge could have required SA Biller to testify first, defense counsel did not suggest that alternative. Upon questioning by the military judge, defense counsel was unable to articulate how SA Biller's testimony would have been influenced by his presence in the courtroom.

The primary focus of the defense attack on SA Biller was to suggest that he had contaminated the eye-witness identification by LCpl Copeland, but SA Biller had already testified on that issue at an Article 39(a)[4] session before he took his seat at the prosecution table. There is no evidence that SA Biller's description of the crime scene, identification of documentary and real evidence, or description of Copeland's reluctance to identify the perpetrators was in any way contaminated by his having heard the testimony of other witnesses. We hold that the military judge did not abuse his discretion.

### DECISION

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges CRAWFORD and EFFRON concur.

4. UCMJ, 10 USC § 839(a).

SULLIVAN, Judge (concurring in the result):

Issue I can be resolved on the basis of waiver. Defense counsel affirmatively waived his objection to admission of the "stat sheet" evidence. Moreover, appellant used this evidence to present his defense of alibi to the members. Nevertheless, I disagree with the majority's "beginning stages of preliminary screening of potential witnesses and suspects" rationale. It ignores the express language of Article 31, UCMJ, 10 USC § 831 ("may interrogate, or request any statement"). See *United States v. Schake,* 30 MJ 314, 317 (CMA 1990).

Issue II also is decided by the majority on a questionable basis. The Supreme Court in *Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 1111–12, 39 L.Ed.2d 347 (1974), did not make the distinction urged by the majority, although lower appellate courts have. See *United States v. Williams,* 963 F.2d 1337, 1340–41 (10th Cir.1992). In any event, I am not persuaded that such an error in the preclusion of this impeachment evidence prejudiced appellant.